Norman M. KRANZDORF, Trustee of
Fidelity America Financial
Corp., et al.

v.

Howard I. GREEN, et al.

Civ. A. No. 83-566.

United States District Court,
E.D. Pennsylvania.

Aug. 11, 1987.

John W. Frazier, IV, John S. Estey, Baldo M. Carnecchia, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiffs.

Francis P. Devine, III, Ruth Ann Price, Philadelphia, Pa., for Allan T. Schiffman.

William J. Barker, Jr., Philadelphia, Pa., for Industrial Valley Agency, Inc.

Perry S. Bechtle, Philadelphia, Pa., for Richard Oppenheim, Finance Co. of America.

Edward Cohen, Philadelphia, Pa., for Gilbert Tucker.

Roberto Rivera-Soto, Philadelphia, Pa., for Bank Leumi Le-Israel, M.B.

Bock & Finkelman, Howard A. Finkelman, Philadelphia, Pa., Howard I. Green, U.S. Management Corp., Green Trust, for Lorraine Martin a/k/a Lori Donahue.

Raymond T. Cullen, Jami Wintz McKeon, Philadelphia, Pa., for Industrial Valley Title Ins. Co.

Michael S. Silberman, Philadelphia, Pa., for John C. Berg, American Real Estate Ass'n.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Norman M. Kranzdorf is the trustee of the Estates of Fidelity America Financial Corporation (FAFCO) (Bankr. 81-385) and three wholly-owned subsidiaries, each named Fidelity America Mortgage Co. (collectively FAMCO), incorporated separately in the States of Pennsylvania, Delaware and Nevada (Bankr. 81-386, 81-387, 81-388 respectively). All the corporations are debtors in reorganization under Chapter 11 of the Bankruptcy Code. The trustee has petitioned this court for approval of a negotiated settlement of pending litigation between FCA Holding Corporation (FCA) and the bankrupt estates.[1]

The Creditors Committee of FAMCO filed formal objections to the proposed settlement contending, in substance, that the petition did not set forth sufficient facts to justify approval. After proper notice to parties in interest, a hearing on the petition was held on July 9, 1987. Mr. Kranzdorf testified concerning the complex factual and legal problems involved in the trustee's claims against FCA and the counterclaims of FCA, the extensive settlement negotiations, results of discovery and investigation to date, and his opinion, based on extensive experience in commercial and bankruptcy litigation that the proposed settlement was

---

1. On petition of the trustee, reference of the respective bankruptcy proceedings was withdrawn from the bankruptcy court for the limited purpose of the district court ruling upon this and other potential proposed settlements. Order of June 9, 1987.

fair, reasonable and in the best interests of the estates.

At the conclusion of the hearing, counsel for both the trustee and for the creditor's committee were afforded an opportunity to file additional briefs and submissions in support of their respective positions. A supplemental memorandum has been filed by the trustee. I have been advised that the creditor's committee does not intend to submit anything additional.

The operation of FAFCO and the formation and operation of the three subsidiary FAMCO corporations were primarily under the control and direction of Howard I. Green and John Berg. Through the efforts of Mr. Green and Mr. Berg, FAMCO and FAFCO, over a period of several years, formed many syndicated private placement real estate investment limited partnerships. As to each limited partnership, one of the FAMCO corporations was the sole general partner. Investors would buy limited partnership shares, making a cash down payment and executing promissory notes and/or letters of credit for the balance of the purchase price, payable usually over a two to five-year period. The funds thus generated were to be invested in certain secured real estate such as mortgages, leaseholds and other equities. To obtain additional funds, the limited partners' notes and letters of credit were utilized as collateral security for additional loans. FCA, a financial lending and factoring institution, provided FAMCO, or particular limited partnerships wherein FAMCO was the general partner, with many loans, receiving the assignment of the limited partners' notes and letters of credit as security. Eventually, FCA provided FAMCO with a revolving line of credit up to $1.5 million, upon FAMCO assigning limited partners' notes and letters of credit having a face value exceeding the amount of the loans.[2]

Mr. Green and Mr. Berg utilized the funds thus obtained from the limited partner investors and the various lending institutions in a massive multi-million dollar fraudulent scheme, best described as a "Ponzi Scheme." Properties were purchased by FAFCO or other controlled corporations and sold at large profits to the limited partnerships. Insufficient funds were generated from the limited partnership investments to repay the loans, and, therefore, additional funds were raised through newly formed limited partnerships whose cash funds were used to pay off overdue loans of other partnerships. Funds became co-mingled. Funds were utilized to pay personal expenses of Green, Berg and others and to make other unauthorized payments. Securities were pledged and repledged. Documents were forged. Eventually the entire enterprise collapsed and FAFCO and FAMCO filed for Chapter 11 protection.

Green and Berg were prosecuted in federal court. As part of the criminal sentence, Green paid $1.3 million in restitution to those limited partner investors who were defrauded in connection with the particular charges as to which he was convicted on a plea of guilty. Berg was ordered to pay $2.5 million to the trustee for the benefit of the defrauded limited partners as part of a term of probation. Approximately one-half of the restitution has been paid to date. The trustee has also received $250,000 from Shirley Ginsberg, another alleged participant in the fraudulent scheme.

Subsequent to the filing of the Chapter 11 petitions, while the debtors were in possession and before the appointment of the trustee, FCA obtained permission from the bankruptcy court to collect on the collateral notes and letters of credit as they fell due. FCA has collected approximately $1 million on these notes and letters of credit post-petition.

In the bankruptcy proceedings, FCA filed proofs of claim totaling about $1.7 million. If the loans made by FCA are legitimate loans, undoubtedly FCA is owed

2. The loans averaged about 80% of the face value of the assigned collateral. On some loans the collateral had a face value of as much as twice the amount of the loan. The transactions, although in the form of loans were, in substance, discounting of the notes, and arguably were in reality purchases of the notes and securities by FCA at a discount, with a possible right of redemption by FAMCO.

a substantial sum of money, either by FAMCO or the limited partnerships. FCA has also filed claims of $750,000 against certain of the bankrupt limited partnerships. This is apparently duplicative of the $1.7 million claim against FAMCO. The $1.7 million claim does not credit the $1 million subsequently received by FCA. Because FAMCO is the general partner of all the limited partnerships, whether the loans were made to the limited partnerships, as FCA contends, or to FAMCO, as the trustee contends, makes no difference as to FAMCO's liability to FCA.

Civil Action 83-566 is an action commenced by the trustee against Green, Berg and others seeking to recover all losses suffered by FAMCO and the limited partnerships and their investors. FCA is a defendant in this action. The claim against FCA is that it aided and abetted Green and Berg in the fraudulent scheme, thus making FCA liable for the total losses estimated to be between $5 million and $7 million. There is no doubt that the funds provided by FCA did in fact aid and facilitate Green and Berg in carrying out their scheme to defraud, and there is no question that there was a scheme to defraud that caused losses to the investor-limited partners. However, investigation and discovery to date, including deposing the officers of FCA, have disclosed no direct evidence that FCA had any knowledge of the fraudulent scheme during the time it was making the loans.

Proof of knowledge is essential to establish liability as an aider and abettor. Such crucial proof could only be obtained through circumstantial evidence, which is not particularly strong. FCA knew that FAMCO was syndicating limited partnerships. FCA had reviewed various private placement memoranda prepared for the investors. FCA may also have been suspicious of the utilization of its funds, because it sought assurance from Green that proceeds for particular loans were being used for the particular identified limited partnerships. There is also evidence that FCA knew the proceeds of at least one loan ostensibly made to a particular limited partnership were used for another limited partnership.

FCA contends that all of the loans were made to identified limited partnerships, not to FAMCO and, thus, the trustee has no claim against it. FCA documents support this contention. FCA contends that it had no knowledge of any wrongdoing or scheme to defraud, and that its officers and employees had very little direct contact with either Green or Berg. FCA asserts that it is a legitimate financial institution and that it merely made loans on appropriate and adequate security for what appeared to be legitimate real estate investments.

The trustee filed adversary proceedings against FCA in bankruptcy court seeking to invalidate certain of the loans made by FCA and to recover certain of the investor-limited partners' notes and security assigned by FAMCO to FCA. Count 1 of the adversary proceeding claims that the loans were made to FAMCO and not to the limited partnerships as FCA claims, and therefore assignment of the notes and security by FAMCO as the general partner was unauthorized and void. Count 2 seeks to recover all sums that FCA has heretofore collected on the assigned notes and security on the same basis as Count 1. Count 3 contends that certain of the loans, if made to a particular limited partnership as contended by FCA, have been overpaid because collections made on the assigned notes and security exceeded the amount of the loans to the particular partnership. This count seeks recovery of the excess payments. Count 4 seeks to recover certain fraudulently backdated assignments as preferences under the bankruptcy code. Count 5 seeks to recover all money collected on the notes and security by FCA, postpetition.

There is a pending motion to dismiss the adversary proceeding. If not dismissed, the trustee may be successful in some of the claims, provided FCA was not a good-faith holder in due course of the notes and security. Even if there may have been some technical flaws in the documentation and paper work, if FCA establishes that it was acting in good faith as a lending institution for what it reasonably believed to be

legitimate business transactions, FCA would probably be found to be a victim and not a party responsible for any deficiencies. As between FCA and FAMCO, the malefactors, Green and Berg, were acting on behalf of FAMCO, and the trustee might therefore be barred from recovery against FCA.

In addition to Civil Action 83–566 and the bankruptcy adversary proceedings, there have been two protective actions filed in state court, Nos. 7241 and 7242, January Term, 1983, C.C.P., Philadelphia County, Pennsylvania, and another proceeding in this court, Miscellaneous 83–36, which duplicate or involve some of the same issues.

In the event the proposed settlement is not approved and the cases proceed to final judicial determination, it is quite apparent that there will be required extensive additional discovery that will be both expensive and time consuming, without any assurance that such discovery will bring to light any additional facts or evidence of any substantial significance. The trustee will be required to employ the services of one or more experts to analyze all of the transactions among FCA, FAFCO, FAMCO and the many limited partnerships and to explain in a comprehensible manner to the fact finder, be it judge or jury, the inter-relationships of the parties and the factors supporting the trustee's contentions. FAMCO records are incomplete and, because of the fraudulent manipulations by Green and Berg, at best suspect. Mr. Kranzdorf testified that there are at least seven filing cabinets of documents believed to have been in the possession of Mr. Green that have never been recovered and cannot be located.

Ultimately, unless the trustee can provide credible evidence that FCA knowingly aided and abetted the fraudulent scheme, or at a minimum was grossly negligent, the trustee will probably not be successful on any of its claims. If, from the perspective of FCA, the transactions were straight-forward collaterized loans, it is obvious that whatever the ultimate accounting balances will establish, FCA loaned or paid out in hard cash substantially more than it has received in repayment. Although the calculations are far from certain, as best as can be estimated on the basis of the present record and representations of counsel, the amount of FCA's balance of unpaid loans is between $700,000 and $1.2 million. FCA presently holds notes and letters of credit from investor-limited partners, that are not subject to other contractual obligations or court orders preventing their utilization, having a face value of about $1.5 million. However, in light of the massive fraud committed against the obligor-investors, there may be valid defenses to the collection of these notes unless FCA is held to be a good faith holder in due course of commercial paper.

Under the terms of the proposed settlement, FCA will pay to the trustee $410,000 plus interest at 7½% from the date of the settlement agreement, May 19, 1987. FCA will also return to the trustee all of the notes and letters of credit provided by the investor-obligors, except those that are subject to other contractual obligations or are presently precluded from being returned by other orders of court. As previously noted, the face value of the documents to be returned to the trustee is about $1.5 million. FCA will surrender all of its claims against the trustee and the limited partnerships. Thus, all litigation between FCA and the trustee will terminate. The trustee will, however, retain all rights to proceed against any and all other parties not heretofore released, and to continue the litigation in Civil Action 83–566 against such other parties.

Proceeding with the pending litigation and suits between FCA and the trustee involve substantial risks and uncertainties for both parties. In substance, the trustee in this case is primarily working for the defrauded investors which make up the major portion of the claims against the estates being administered by the trustee. Undoubtedly, the losses of the investors and creditors will never be recovered in full, whether by litigation or settlement with all parties potentially responsible. The trustee has diligently sought and continues to seek the fullest recovery possible.

Whether the notes and other securities that the trustee will receive from FCA will be collectible is not presently before me. Superficially, however, receipt of them by the trustee appears to be of substantial benefit to the bankrupt estates. If collectible, they will ultimately go to the primary benefit of all defrauded creditor-investors. If not collectible because of valid defenses, it would appear that they would thereby reduce the claims of the investor-obligors against the bankrupt estates by an equal amount. Thus, receiving the notes and letters of credit will benefit the bankrupt estates and/or the defrauded investors.

The creditors committee's formal objection to the proposed settlement contended that the petition failed to set forth sufficient facts to establish the relevant factors set forth In Re Neshaminy Office Building Associates, 62 Bankr. 798 (E.D.Pa. 1986). Those factors are: (1) probability of success in the litigation; (2) likely difficulties in collection; (3) the complexity of the litigation, and the expense, inconvenience and delay necessarily attending it; (4) the paramount interests of the creditors. Id. at 803. Accepting these as being the major considerations in determining whether a proposed settlement in a bankruptcy matter should be approved and that the burden is on the trustee-proponent to establish the reasonableness of the settlement, I conclude on the basis of matters of record, including the testimony of the trustee at the hearing, that the settlement should be approved. The four factors will be considered seriatim.

I have already discussed the probability of success. At best, the final outcome is quite uncertain and in the final analysis may depend on the fact finder's determination of credibility of witnesses as to knowledge of FCA. Obviously, the trustee believed, when he instituted the various actions, that he had a reasonable chance of total or at least partial success. Based on his testimony at the hearing, he is still of that opinion. It must be borne in mind, however, that FCA has very substantial counterclaims against the bankrupt estates which, based on the face of documents in its possession, are valid claims for unpaid loans. Because FCA's claims are against bankrupt estates, even if successful, FCA would not be able to collect in full any monetary judgment it might obtain. However, FCA might be able to collect on the notes and letters of credit executed by the investor-obligors, who are themselves creditors and/or claimants against the bankrupt estates. The quantitative relative probabilities of success between FCA and the trustee would require a fact specific prognostication as to whom the fact finder will ultimately find the more credible. Credibility judgments are of necessity largely subjective and often intuitive. At this stage of the proceedings, both parties can logically claim the greater probability of success, but neither can reasonably quantify the probabilities.

Little is known of FCA's financial ability to pay any substantial monetary award. So far as is known, FCA is a solvent entity continuing in its business enterprises. For purposes of the present analysis, I will assume that it has sufficient assets to permit the trustee to collect any judgment that might be awarded against FCA in this litigation. Thus, this factor does not suggest that the trustee should accept any lesser sum in settlement than is otherwise appropriate.

As previously noted, the total litigation between FCA and the trustee is quite complex. Complicating the factual development of this litigation is the knowledge that many of the documents are inaccurate, false and/or outright forgeries. Many documents cannot be located. Tracing the proceeds received from loans from FCA and also the proceeds of money received from limited partners may prove to be virtually impossible. Before the issues could be brought to trial, extensive additional discovery would be required. Detailed analysis by accounting and real estate investment experts would be vital. Because of the many issues and substantial sums involved, it would appear almost certain that appeals would follow any final district or bankruptcy court decision. Continuing this litigation will, therefore, involve extensive expense by the trustee whose available

funds have been largely derived from other settlements and payments made to the trustee by the primary malefactors. Conclusion of this litigation in less than two years would appear unlikely and unrealistic.

The interest of the creditors, including the defrauded investors, is, of course, to obtain the maximum net recovery possible. Not approving the settlement could benefit creditors only if the net recovery eventually received would be greater than offered by the settlement, an entirely speculative and uncertain prospect. Based on the testimony of Mr. Kranzdorf, which I find to be credible, and the extensive arm's length negotiations conducted with FCA, it is apparent that a more favorable settlement cannot realistically be hoped to be negotiated. Disapproval will force the trustee to proceed with litigation that not inconceivably might prove to be totally unsuccessful.

Any objective consideration of the proposed settlement, based on all information available, leads me to conclude that the proposed settlement is fair, equitable and reasonable and will be in the best interests of the estate. In reaching this conclusion, I am, of course, relying to some extent upon the trustee's own assessment of the proposed settlement and his conclusion that it is in the best interests of the estate to settle the matter in accordance with the terms negotiated. Nothing appears in the record and nothing has been suggested by counsel that Mr. Kranzdorf's analysis is incorrect.

The proposed settlement will be approved.

### ORDER

AND NOW, this 11th day of August, 1987, upon consideration of the Motion for Approval of Settlement Agreement Between Norman M. Kranzdorf, as Trustee, and FCA Holding Corp., and the response thereto, it is hereby ordered that:

1. The above-mentioned motion is GRANTED.

2. The Settlement Agreement dated May 19, 1987, by and between Norman M. Kranzdorf, as Trustee, and FCA Holding Corp. (formerly The Finance Company of America) is APPROVED.

3. The Trustee is hereby granted leave to dismiss this action as against FCA Holding Corp. with prejudice by the filing of a Notice of Dismissal upon receipt of the payment described in the above mentioned Settlement Agreement; such dismissal is expressly without prejudice as to the Trustee's claims against any other person or entity;

4. Norman M. Kranzdorf, as trustee, is authorized to perform such actions as are necessary to carry out the terms of the above-mentioned Settlement Agreement; and

5. FCA is authorized to perform such actions as are necessary to carry out the terms of the above-mentioned Settlement Agreement, including the payment of the monetary consideration set forth in such agreement, within five (5) days of the date this order becomes final.