In re Estelle GOLDSTEIN, Debtor.

James and Barbara MALLOY, Robert and Carole Johnson, Peter and Gina Cammerota, Harry and Helen Murray, Kyran and Margaret Gilbert and Barbara Uhl, Plaintiffs,

v.

Estelle GOLDSTEIN, Defendant.

Thomas & Florence DRUDING, h/w, John & Annelva Mooney, h/w, John & Frances Schwartz, h/w, Francis & Paul Kircher, Jr., h/w, Annemarie Mooney Greene, Plaintiffs,

v.

Estelle GOLDSTEIN, Defendant.

Bankruptcy No. 90–11473S.
Adv. Nos. 90–0676S, 90–0696S.

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 1, 1991.

---

Diane S. Tosta, Norristown, Pa., for debtor.

Marc Vogin, Philadelphia, Pa., for plaintiffs in Adv. No. 90–0696S.

Stephen Raslavich, Philadelphia, Pa., Trustee.

George J. Badey, III, Philadelphia, Pa., for plaintiffs in Adv. No. 90–0676S.

Michael P. Morley, Philadelphia, Pa., for plaintiffs in Adv. No. 90–0733S.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

In their present, final state, the two instant almost identical proceedings present one issue for disposition: whether, pursuant to 11 U.S.C. § 727(a)(3), the Defendant/Debtor, ESTELLE GOLDSTEIN ("the Debtor"), should be denied a discharge of all of her debts. In deciding this issue, we consider whether the Debtor has failed to keep, and/or has justified her failure to keep, records of the transactions involving the Plaintiffs' investments in an undertaking wherein the Debtor solicited the said investments in a plan involving a contractor who was to use the funds to rehabilitate and sell certain residential real estate. We find that the complexity and large total amount in issue in the transactions demanded more complete and better organized records than were produced by the Debtor. We decline to accept her defenses that her alleged lack of fault, alleged lack of sophistication, and alleged limited role in the transactions justified her failure to maintain coherent and complete records. We therefore enter a judgment denying the Debtor's discharge.

### B. PROCEDURAL HISTORY

On April 2, 1990, the Debtor filed a voluntary petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code. An Order was entered on June 18, 1990, scheduling the First Meeting of Creditors pursuant to 11 U.S.C. § 341 ("the Meeting") on July 17, 1990, and setting September 17, 1990, as the deadline for the filing of complaints in opposition to the discharge of the Debtor. Ultimately, the Meeting was held on July 24, 1990, although the deadline for filing opposition to the Debtor's discharge remained unchanged.

Three very similar Complaints objecting to the dischargeability of the Debtor's indebtednesses to three separate groups of plaintiffs in the three proceedings were filed. In one instance, the plaintiffs also objected to the Debtor's discharge.

The first proceeding, Adversary No. 90–0676S ("the Malloy Case" or "*Malloy*"), was filed on August 20, 1990, on behalf of five married couples and one individual who invested and lost a total of $40,000.00 [1] and was substantively based exclusively on 11 U.S.C. § 523(a)(2)(A).[2]

The second proceeding, Adversary No. 90–0696S ("the Druding Case" or *"Drud-*

---

1. The individual Plaintiffs and their respective claims are as follows:

| (1) | James and Barbara Malloy | $ 5,000.00 |
|---|---|---|
| (2) | Robert and Carole Johnson | $ 5,000.00 |
| (3) | Harry and Helen Murray | $ 5,000.00 |
| (4) | Peter and Gina Cammerota | $ 5,000.00 |
| (5) | Kyran and Margaret Gilbert | $ 5,000.00 |
| (6) | Barbara Uhl | $15,000.00 |
| | | $40,000.00 |

2. The Plaintiffs allege that the Debtor took their money "with knowledge of inability to repay the principal investment plus interest ... without the intent to repay the principal investment with the interest ... [and] obtained the ... moneys through false pretenses, false representations, and/or actual fraud...." *Malloy* Complaint, at 4, ¶¶ 16–17.

*ing* "), was commenced on August 30, 1990. It sought not only the non-dischargeability of the respective indebtednesses of the Debtor to the four married couples and one individual plaintiff who invested in excess of $83,600 [3] pursuant to 11 U.S.C. § 523(a)(2)(A),[4] but also averred that the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a).[5]

The third proceeding, Adversary No. 90–0733S ("the Duffy Case" or *"Duffy"*) was not filed until September 21, 1990, and included, as Plaintiffs, two married couples and nine individuals whose investments totalled over $121,000.[6] The *Duffy* Complaint recited dischargeability claims only, under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).[7]

Upon becoming aware of certain pleadings in this case indicating that the parties agreed that all three proceedings should be consolidated for trial and that the Debtor had filed a Motion to Dismiss all three of the proceedings, we entered an Order of October 22, 1990, consolidating the matters, setting them for trial on December 13, 1990, and requiring the parties to mark and exchange witness lists and exhibits beforehand; and an Order of October 30, 1990, requesting Briefs on the Motion to Dismiss

to be filed by November 8, 1990 (the Debtor), and November 19, 1990 (the Plaintiffs).

The Debtor failed to submit her Brief, requesting a settlement conference instead. On December 7, 1990, the Honorable Judith H. Wizmur of the District of New Jersey conducted such a conference, but was unable to bring the matter to a resolution. On the day of trial, the parties engaged in further unsuccessful settlement negotiations.

Prior to commencing the trial, we engaged in a colloquy with counsel for the Debtor and for the Duffy Case Plaintiffs regarding the tardy filing of the Complaint in that proceeding. We observed that the Debtor had listed all of the *Duffy* Plaintiffs as creditors in her Schedules and that court records indicated that notice of the Meeting had been sent to all of these parties. Nevertheless, counsel in each of the proceedings argued vociferously that many of their clients had not received notices of the Meeting. All counsel did admit that they were well aware of the Debtor's intention to declare bankruptcy even prior to her filing of this case and that they became aware of the actual filing shortly after it occurred and prior to the Meeting.

---

3. The individual Plaintiffs and their respective investment amounts are as follows:

| | | |
|---|---|---:|
| (1) | Thomas and Florence Druding | $12,158.90 |
| (2) | John and Annelva Mooney | 29,846.33 |
| (3) | John and Frances Schwartz | 19,463.19 |
| (4) | Frances and Paul Kircher, Jr. | 15,522.83 |
| (5) | Annemarie Mooney Green | 6,614.24 |
| | | $83,605.49 |

4. In support of their § 523(a)(2)(A) claim, the *Druding* Plaintiffs averred that the Debtor obtained the investment funds "with knowledge of her inability to repay the principal investment plus interest ... without the intent to repay the principal investment plus interest ... [and] by false pretenses, false representations and/or actual fraud." *Druding* Complaint at 3, ¶¶ 15–16.

5. In this regard, the *Druding* Complaint alleged that "Defendant—Debtor has unjustifiably failed to keep and/or concealed, destroyed and/or mutilated the financial records concerning Plaintiffs' investments, their whereabouts and/or use" and that "[b]y Defendant—debtor's aforesaid action, she has concealed assets in order to prevent Plaintiffs from obtaining access to them in these proceedings." *Druding* Complaint, at 4, ¶¶ 24–25.

6. The individuals Plaintiffs and their respective amounts invested were as follows:

| | |
|---|---:|
| William Duffy | $17,812.50 |
| Thomas Logan | 7,807.50 |
| Jack and Anna M. Muldowney | 5,937.50 |
| Harry Bell | 6,250.00 |
| William Morrison | 15,250.00 |
| Dennis Short | 25,000.00 |
| Philip Renzi | 14,500.00 |
| Joseph Lamplugh | 5,927.50 |
| Amelia Lamplugh | 2,375.00 |
| Daniel Adams | 6,250.00 |
| Joseph and Kathleen Adams | 14,250.00 |
| | $121,360.00 |

7. The Complaint alleged that "[t]he defendant obtained the plaintiffs' above-mentioned moneys through false pretenses, false representations and/or actual fraud by the defendant" and that "[t]he debts incurred by defendant were incurred through fraud or defalcation, and misrepresentation, while acting in a fiduciary capacity, and constituted a violation of the defendant's fiduciary duties to the plaintiffs." *Duffy* Complaint, at 5, ¶¶ 21, 25.

As a result of this colloquy, we orally dismissed the Duffy Case on the basis that it was filed beyond the bar date set forth in Bankruptcy Rule 4004(a). Accordingly, we stated as follows in reference to this issue in our post-trial Order of December 13, 1990:

[a]ssuming *arguendo* that the Plaintiffs in [the Duffy Case] received no notice of the bar date, contrary to the court records, the [*Duffy*] Plaintiffs and their counsel could not deny that they knew about the filing of the Debtor's bankruptcy from its inception and therefore were obliged to ascertain the bar date. *See, e.g., In re Sam,* 894 F.2d 778, 781 (5th Cir.1990); *In re Compton,* 891 F.2d 1180, 1184–85 (5th Cir.1990); *In re Green,* 876 F.2d 854 (10th Cir.1989); *In re Alton,* 837 F.2d 457 (11th Cir.1988); *In re Barton,* 82 B.R. 50, 51 (W.D.Mich. 1985); *In re Ricketts,* 80 B.R. 495, 497 (Bankr. 9th Cir.1987). *Cf. In re Main,* 111 B.R. 535, 538 (Bankr.W.D.Pa.1990).

We then proceeded to the trial of the remaining two proceedings. The only witnesses were three of the various Plaintiffs (several minutes each) and the Debtor (several hours). By our Order of December 13, 1990, we established a schedule whereby the remaining Plaintiffs and the Debtor were to file Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs supporting their respective positions by January 14, 1991, and January 25, 1991. We also scheduled another last-ditch settlement conference before Judge Wizmur on January 25, 1991. However, the impetus to settle had apparently diminished, and again no resolution was reached.

## C.  FACTUAL HISTORY

The unsuccessful "investment plan" ("the Plan") which serves as a backdrop for this matter began to unfold in April, 1986.

Prior to that time, from approximately 1958 to 1983, the Debtor had been employed by the City of Philadelphia's Department of Recreation in South Philadelphia as a "playground leader" and "playground director," and she was well known in the community. In 1983, she became the proprietor of an insurance agency and was licensed as an assistant general insurance agent. In her business of selling life insurance and annuity products, she shared equal status with one George Kuney ("Kuney"), who also was licensed as an assistant general insurance agent. The Debtor testified that Kuney maintained all of the books and records of this business. Her responsibility, much like in the Plan, was to solicit prospective customers among her contacts in the community.

About the time of her involvement in the Plan, the Debtor was also involved in solicitation of funds for stock investment in a so-called Norwich Investment Program with an investment broker. This undertaking was destroyed by the stock market crash of October 19, 1987, and the broker's personal difficulties.

Most of the Plaintiffs knew the Debtor for many years and participated in the Plan because of the Debtor's good reputation in the community. The substance of the Plan was the Debtor's procuring monies from individuals to fund the acquisition and rehabilitation of residential properties by one Bernard Bunn ("Bunn"),[8] with the intent of Bunn's selling the properties for a profit subsequent to rehabilitation. The Plaintiffs who testified indicated that they were attracted to the Plan because it proposed to help the community and to help provide housing to "everyday people" like themselves.

The investments were memorialized by contracts which read, in pertinent portions, as follows:

---

**8.** Bunn has also filed a bankruptcy case in this court, at Bankr. No. 90–11517F, which was assigned to our colleague, the Honorable Bruce Fox. Bunn has also been the subject of dischargeability challenges from the same three groups of parties who are or were plaintiffs in the cases filed in connection with this case here. These proceedings, Adversary Nos. 90–0511F, 90–0550F, and 90–0603F, have been reported settled.

## LOAN AGREEMENT [9]

... _____ hereby agrees to loan to [10] Bernard Bunn hereinafter known as ("Bunn") and Estelle Goldstein ("Goldstein") ... the sum of _____ (the "INVESTMENT") upon the following terms and conditions:

1.) _____ agrees to invest _____ investment at "Bunn & Goldstein's" discretion;

2.) Bunn and Goldstein agree to invest the INVESTMENT in such a manner that it will yield interest at the rate of ____ [11] percent or more per annum;

3.) Bunn and Goldstein agree to repay to _____ the INVESTMENT, plus interest, within ____ [12] months of this date....

The Debtor testified that she viewed the sums received from all of the Plaintiffs as investments from them. The Plaintiffs testified that they believed that the funds were loans.

Monies received from the Plaintiffs were commingled by the Debtor with her personal funds in her own bank accounts. The Debtor would then transfer the monies to Bunn, who purchased and began to rehabilitate the properties. The Plan contemplated that Bunn would thereafter sell the properties, and repay the investors' principal investment, along with a specified return, via the Debtor. The Debtor contends that her role was strictly to solicit prospective investors and to "aid" the investors, but that she had nothing to do with purchasing the realty, doing the rehabilitation work, or selling the realty. According to the Debtor, she and Bunn were "informal partners" in the Plan; no documents were filed with the Commonwealth of Pennsylvania reflecting any partnership.

At the outset, individuals who invested monies were repaid the principal and handsome interest for their investments. The Debtor testified that it was not until late summer or early autumn, 1987, after most of the investments had been made, that she began to realize that the Plan was not progressing as expected. On October 29, 1987, upon requesting funds to repay an investor owed over $100,000 who had threatened her life if non-payment persisted, the Debtor was notified by Bunn that the Plan's funds were exhausted, and that he would not be able to reimburse this investor or any investors from the Plan's proceeds any longer.

Despite this realization, the Debtor continued to solicit and to enter into investment contracts. In the last months of 1987, the Debtor attempted to get personal "swing loans" to repay investors until Plan properties began to sell. Although she was not always successful, she did acquire a personal loan from Vanguard Savings and Loan Association in February, 1988, and she used these funds to pay the investor who had threatened her life.

In January, 1988, the Debtor held a meeting of most or all of the investors in the Plan. During the course of the meeting, the Debtor assured the disgruntled investors that their investments would be repaid as contracted. She informed them that she was starting a new business, ultimately known as Equity Partnerships I, to raise funds to help repay the debts owed to them. Equity Partnerships I was a realty investment company formed with Kuney and Bunn. It also failed to succeed. In 1988, the Debtor made personal investments and solicited investments from others, including Plan participants, in other exotic business deals to help raise funds to keep the Plan afloat. These business deals included an enterprise to operate a cruise ship to be located off shore near New Orleans, Louisiana, which would contain a gambling casino, and the purchase of a building to house a gambling school for prospective students in connection with the

---

9. Some of the contracts are entitled simply "AGREEMENT."

10. Some of the contracts state "invest with" instead of "loan to."

11. 25% is written in on most of the contracts, although some have as much as 50% and 100% written in.

12. 270 days, 9 months appears to be written in on most of the contracts, but some have shorter periods written in.

ship. Another deal involved the funding of a "bingo barn" to be built on an Indian reservation in Oklahoma.

When these business deals failed to generate the necessary funds to repay the investors in the Plan, the Plaintiffs in the *Malloy* Case, on November 18, 1988, filed a civil action against the Debtor and Bunn in the Court of Common Pleas for Philadelphia County, ("the CP Court"), November Term, 1988, No. 2403. The Debtor and Bunn, then represented by one attorney who was different from either of their separate respective bankruptcy counsel, agreed to a stipulated judgment for the amounts prayed for in the Malloy Case. The Stipulation, approved by the CP Court on January 23, 1990, provided, in part, as follows:

> 10. In connection with the entry of the aforesaid judgment, it is understood that plaintiffs are aware that the defendants are contemplating filing for bankruptcy in the near future. The plaintiffs take the position that the aforesaid judgments/debts are not dischargeable in bankruptcy. The defendants take the position that the aforesaid judgments/debts are dischargeable in bankruptcy.

Predictably, the filing of the Debtor's bankruptcy case followed on April 7, 1990. This history undoubtedly caused the Plaintiffs and their respective counsel in all three proceedings to be aware that the Debtor's and Bunn's respective cases were forthcoming.[13]

The legal strategy of the Plaintiffs evolved during the course of these proceedings, perhaps as a result of their enlightenment at the settlement conference with Judge Wizmur on December 7, 1990, perhaps because of the dismissal of the *Duffy* Case; or perhaps for reasons unknown to us. The initial strategy was to label the Debtor as a willing participant in a "Ponzi scheme"[14] and hence prevent the discharge of only their own obligations pursuant to 11 U.S.C. § 523(a)(2)(A). This strategy was, however, virtually abandoned in favor of an attack on the Debtor's discharge under 11 U.S.C. § 727(a)(3) at trial, which would of course benefit all of the Debtor's creditors equally, including the Duffy Case Plaintiffs.

The focus of an action under § 727(a)(3) is upon the Debtor's records. At trial, the Debtor produced a large morass of records. Included were masses of bank deposit slips, cancelled checks drawn from the Debtor's personal accounts to Bunn and to several of the "early" investors paying their "returns," personal income tax records, copies of a few of the many investment contracts relating to the Plan, miscellaneous documents relative to several of the Debtor's various business enterprises, and an undated, typed list of the status of several of the properties targeted for rehabilitation by Bunn, copies of pages of a spiral notebook in which the Debtor recorded all of the investments made by participants in the Plan and participants in her other business deals, and a typed version of the entries in the spiral notebook relating to the Plan.

---

**13.** This history was a factor in our dismissal of the *Duffy* Case, as described at pages 517–518 *supra*.

**14.** A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists. *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d 528, 531 (9th Cir.1990). *See also*

*Kranzdorf v. Green*, 76 B.R. 974, 975 (E.D.Pa. 1987).
The success of such a claim, even if assisted by the recent decision in *Grogan v. Garner*, — U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (elements of § 523(a)(2)(A) proceeding need be established only by a "preponderance of the evidence" rather than by "a clear and convincing evidence" would have been very difficult to sustain as to investments prior to October, 1987, because there was no evidence that as of that date, the Debtor became aware that promises of repayment might well be impossible to fulfill prior to that date. *See, e.g., In re Cirineo*, 110 B.R. 754, 757 (Bankr.E.D.Pa.1990). The vast majority of investments of the Plaintiffs were made prior to that date.

Although the Debtor admitted her role as a solicitation and disbursement "agent" of the Plan, and the entries relating to the Plan indicated that she had collected over $770,000 and owed approximately $400,000 to disgruntled investors at the time of her bankruptcy filing, she also admitted that she did not so much as reconcile her checkbooks with monthly statements, and did not retain her monthly banking statements.

The Debtor characterized herself, accurately, as a poor record keeper. Moreover, she contended that her records properly only concerned the taking in of investment funds and paying out of monies in accordance with these investments, since that all other aspects of the Plan were in Bunn's hands. Although present at trial under a subpoena from the Debtor, Bunn was not called to testify by any of the parties.

D. IN DETERMINING WHETHER A DEBTOR'S DISCHARGE MUST BE DENIED UNDER 11 U.S.C. § 727(a)(3), A COURT MUST CONSIDER SEVERAL FACTORS, INCLUDING THE COMPLEXITY OF AND AMOUNTS INVOLVED IN THE BUSINESS, THE DEBTOR'S SOPHISTICATION, THE DEBTOR'S CULPABILITY, AND ANY EXPLANATIONS PROVIDED FOR A FAILURE TO KEEP BETTER RECORDS.

Section 727(a)(3) of the Bankruptcy Code instructs courts to exempt from discharge any debtor who

has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; ...

The seminal case on "maintenance of records," which sets forth many of the general principles applied in contemporary § 727(a)(3) analyses, is *In re Underhill*, 82 F.2d 258 (2d Cir.), *cert. denied sub nom. Underhill v. Lent*, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936). This case involved the appeal of a creditor to the discharge of a debtor who was apparently forced to file for bankruptcy as a result of his extensive, yet unsuccessful, forays into the stock market. As a result of these activities, the debtor owed $190,000.00 in liabilities to banks, investment houses, and individuals. *Id.* at 259. Although the debtor was college-educated and was the officer of a number of banking institutions, he failed to keep written records of his various transactions beyond such documents as duplicate deposit slips, income tax reports, some cancelled checks, check books with notations on the stubs, receipts, and brokerage account statements. *Id.*

The court began its analysis by noting the absence of any requirement to keep books in any particular form. *Id.* at 259–60. The court concluded that the appropriateness and necessity for maintaining written information is a function of the reasonableness in each particular situation and whether complete disclosure can be achieved by the maintenance of books and records. *Id.*

However, as in *Underhill, id.* at 260, where a debtor is involved in

many transactions of an extensive character, a substantially accurate and complete record of his affairs is a prerequisite to his discharge[;] [w]ith obligations outstanding in large sums in the form of notes to banks and to others, it [i]s a matter of importance that [the debtor] maintain records from which his financial condition could be ascertained.

The court recognized that this duty may be fulfilled through records which are not books. *Id.* However, it held that records of sufficient completeness and accuracy are required for determining whether a debtor has provided a credible justification for failure to keep written information and for checking the "oral statements or explanations made by the [debtor]." *Id.* Finding that the debtor "has not justified his failure to keep books of account," the court reversed an Order granting the debtor a discharge. *Id.*

In objecting to the Debtor's discharge, the Plaintiffs bear the burden of

proving by a preponderance of the evidence [15] that the Debtor failed to preserve adequate recorded information. If the Plaintiffs successfully carry their burden, the Debtor must prove that she maintained adequate written information or justify her failure to maintain records "to the point where it reasonably appears that because of unusual circumstances [s]he was under no duty to keep them[,]" or that her failure to maintain books and records was justified under the facts of the case. *In re Sandow*, 151 F.2d 807, 809 (2d Cir.1945). *See also Office of the Comptroller General of Bolivia v. Tractman*, 107 B.R. 24, 26 (S.D.N.Y.1989); *In re MacPherson*, 101 B.R. 324, 326 (Bankr.M.D.Florida 1989); and *In re Esposito*, 44 B.R. 817, 816 (Bankr.S.D.N.Y.1984).

In adjudicating a § 727(a)(3) proceeding, the law will be applied in favor of the Debtor. *See, e.g., In re McCoy*, 114 B.R. 489, 500 (Bankr.S.D.Ohio 1990); *Garcia, supra*, 88 B.R. at 702; *In re McCall*, 76 B.R. 490, 496 (Bankr.E.D.Pa.1987); *Somerville, supra*, 73 B.R. at 833; and *In re Woerner*, 66 B.R. 964, 971 (Bankr.E.D.Pa.1986), *aff'd*, CA. No. 86-7324 (E.D.Pa. April 28, 1987). This court therefore recognizes that "[p]ublic policy requires that objections to discharge not be easily granted." *Somerville*, 73 B.R. at 833, citing, *Woerner*, 66 B.R. at 971. Despite these considerations, the fundamental purpose of § 727(a)(3) continues to be to insure that the trustee and the creditors receive adequate information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions. *See, e.g., In re Cox*, 904 F.2d 1399, 1402 (9th Cir.1990); *In re Decker*, 595 F.2d 185, 187 (3d Cir.1979); *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir.1971); *In re Rusnak*, 110 B.R. 771, 776 (Bankr.W.D.Pa. 1990); *McCall, supra*, 76 B.R. at 497; and

*In re Schultz*, 71 B.R. 711, 716 (Bankr.E.D. Pa.1987).

In a § 727(a)(3) analysis, an intent to conceal financial condition is no longer a prerequisite to support an objection to a discharge for failure to maintain books and records. *See e.g., Koufman v. Sheinwald*, 83 F.2d 977, 979 (1st Cir.1936); *Underhill, supra*, 82 F.2d at 259; and *Trinsey, supra*, 114 B.R. at 91. *Compare In re Russell*, 52 F.2d 749, 753 (D.N.H.1931); and *In re Schiff*, 5 F.2d 512, 514 (S.D.N.Y.1925). Further, in determining whether a debtor's written documentation is sufficient under § 727(a)(3), the bankruptcy court has broad discretion. *See, e.g., Johnson v. Bockman*, 282 F.2d 544, 546 (10th Cir.1960); *In re Marx*, 125 F.2d 335, 336 (7th Cir.1942); *McCall, supra*, 76 B.R. at 497; *In re Brown*, 56 B.R. 63, 66 (Bankr.D.N.H.1985); and *In re Kottwitz*, 42 B.R. 566, 570 (Bankr.W.D.Mo.1984).

Case law has established the existence of the following factors which, when applied to the facts of a particular case, aid the bankruptcy court in applying its discretion to determine the adequacy of a debtor's financial records:

whether a debtor was engaged in business and, if so, the complexity and volume of the business; the amount of the debtor's obligations; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's education, business experience and sophistication; the customary business practices for record-keeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's existing books and records; the extent of any egregious conduct on the debtor's part; and the debtor's courtroom demeanor.

*In re Minesal*, 81 B.R. 477, 481 (Bankr.E.D.Wis.1988), citing *McCall, supra*. *See also, Rhoades, supra*, 453 F.2d at 53; *In re*

---

**15.** Although the judges of this court have regularly applied the "preponderance of the evidence" test in § 727(a)(3) cases, *In re Trinsey*, 114 B.R. 86, 90 (Bankr.E.D.Pa.1990); *In re Garcia*, 88 B.R. 695, 703 (Bankr.E.D.Pa.1988); and *In re Somerville*, 73 B.R. 826, 834 (Bankr.E.D.Pa.1987), several courts have held that a "clear and convincing evidence" standard applies in all § 727 cases. *See, e.g., In re Montgomery*, 86 B.R. 948, 955 (Bankr.N.D.Ind.1988). The result in *Grogan v. Garner, supra*, strongly suggests that a "preponderance of the evidence" test should be applied in all § 727 proceedings as well as all § 523 matters.

*Shervin, Fox v. Shervin,* Bankr. No. 88–12803F, Adv. No. 89–1111F, slip op. at 18–23 (Bankr.E.D.Pa. Sept. 19, 1990); *In re Graham,* 111 B.R. 801, 806 (Bankr.E.D. Ark.1990); *In re Trogdon,* 111 B.R. 655, 658 (Bankr.N.D.Ohio 1990); *In re Mart,* 87 B.R. 206, 210 (Bankr.S.D.Fla.1988); and *In re Drenckhahn,* 77 B.R. 697, 707–08 (Bankr.D.Minn.1987).

In addition, § 727(a)(3) expressly provides that a debtor may "justify" his failure to maintain and produce pertinent books and other records. In addition to alleging that lack of sophistication excuses such non-compliance, *see, e.g., In re Hughes,* 873 F.2d 262, 264 (11th Cir.1989); *Rusnak, supra,* 110 B.R. at 776; and *Schultz, supra,* 71 B.R. at 717, which has already been noted as a factor, debtors have occasionally argued that their subordinate role in a business operation excused their compliance in reliance on others having a more significant involvement. *See Cox, supra,* 904 F.2d at 1402–03; *Rhoades, supra,* 453 F.2d at 52–53; *MacPherson, supra,* 101 B.R. at 326; and *In re Buck,* 75 B.R. 417, 420–22 (Bankr.N.D.Cal.1987). An innocent spouse, *MacPherson,* 101 B.R. at 326, or one who reasonably relies upon a spouse to perform recordkeeping, *Cox,* 904 F.2d at 1403, may thereby justify a failure to maintain records. However, a spouse who is a "knowing and active participant in the scheme to defraud," *Buck, supra,* 75 B.R. at 421, or who has a clear individual duty to maintain records, *Rhoades, supra,* 453 F.2d at 52–53, will not be exonerated by such a defense.

E. THE INSTANT DEBTOR MUST BE DENIED A DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(3) IN LIGHT OF THE SUBSTANTIAL COMPLEXITY AND LARGE AMOUNTS INVESTED IN THE PLAN, THE POOR QUALITY OF HER RECORDS, AND THE UNJUSTIFIED RELIANCE OF THE DEBTOR UPON BUNN.

The Debtor's testimony made it clear to us that the Plan was not a "Mom and Pop" operation, even though we accept the Debtor's statement that she and Bunn "ran it by the seat of their pants." The Plan was not a simple operation. It contemplated the purchase (typically via sheriff's sales), rehabilitation, and eventual sale of properties, the number of which, at one point, totalled twenty-two (22). Necessarily involved in such a process would be such matters as ordering title searches and acquiring insurance, hiring and paying contractors, and the actual sale of each property with all the typical negotiative haggling. In addition to these considerations, there was the necessity of rehabilitating and selling the properties fast enough to maintain a sufficient cash flow to enable the payment of investment contracts as they came due.

A strong factor against the Debtor, in addition to the complexity of the Plan, was the large amounts of money received by the Debtor and Bunn in its furtherance. The Debtor's spiral notebook records remittances of over $775,000 in connection with the Plan, and about $440,000 in debt to investors under the Plan is recorded in the same notations. *Compare Trogdon, supra,* 111 B.R. at 659 (principal basis for denial of discharge was the debtor's inability to explain disposition of $4,500). The Plan therefore was, by any definition of the terms, both a large and complex undertaking.

The size and complexity of the Plan is borne out by the inability of the Debtor to provide any coherent explanation of precisely why the Plan failed.

The next of the factors to be considered which we enunciated at pages 522–523 *supra,* is whether the failure to keep written information was the fault of the Debtor. The facts in this case indicate that, in reference to the Plan, as well as the Debtor's earlier insurance business, either the Debtor carefully avoided recordkeeping responsibilities and foisted them on her respective business partners, or viewed the maintenance of books and records with a studied indifference. Considering the funds the Debtor was directly receiving from and disbursing to investors (as investment contracts came due) as the "soliciting agent" of the Plan, we are unable to accept her

contention that maintenance of books and records, such as a cash receipt book or even a general ledger, was not a necessity. Clearly, the fault for failing to keep books and records regarding the investments rested firmly on the Debtor's shoulders.

As to business experience and sophistication, the facts indicate that the Debtor, while far from a well-educated archetype of a slick white-collar criminal, was far from being a novice in the world of business transactions. She was the owner of an insurance agency, and continues to possess Commonwealth licensure to sell insurance products such as life insurance contracts and annuities. She had a primary involvement in several complex (and unusual) business transactions. She was also a fundraiser and "soliciting agent" in such enterprises as the Norwich Investment Program, the floating gambling casino and school in New Orleans, and the funding of a "bingo barn" on an Indian reservation. Finally she was President and a shareholder of Equity Partnerships I.

As a result, we cannot categorize the Debtor as a "wage-earner," *In re Weismann*, 1 F.Supp. 723, 723 (S.D.N.Y.1932), or as a person merely "working as salesman on commission." *In re Clark*, 46 F.Supp. 371, 372 (S.D.N.Y.1942). Rather, we find that she was one of the two principals involved in setting up and administering the Plan.

Especially considering the large amount of outstanding obligations owed by the Debtor to the Plan's investors, we find that the Debtor's recordkeeping was woefully incomplete. Clearly, it does not enable us to ascertain the reasons for the financial demise of the Plan. Nor does it comport with the customary practices of more conventional, and therefore more easily comprehended, real estate investment plans, *see Schultz, supra;* and *In re Sherman*, 24 B.R. 507 (Bankr.E.D.Pa.1982), or investment plans generally. *Underhill, supra;* and *Rusnak, supra.* The subject matter of the Plan involved activities for which records generally are kept. *Compare In re Hirsch*, 36 B.R. 643, 645 (Bankr.S.D.Fla.

1984) ("Gambling is an activity for which records are rarely kept.").

In the comparable *Schultz* case, the debtor was involved in buying parcels of land and building houses on them. This type of real estate operation was similar to the Plan in that it involved purchasing properties, acquiring insurance, and hiring workers to develop the properties. However, it did not involve the added unusual aspects of purchasing properties at sheriff's sales, or that of two principals, one doing the solicitation function apart from the other doing the construction function.

The *Schultz* debtor maintained that the financial condition of the debtor estate was readily established from the items he filed before the court, *i.e.,* "cancelled checks in his corporate checking account ... copies of all checks and check stubs ... a summary of receipts of the business and disbursements, and all other documentation of deposits...." 71 B.R. at 717. However, Chief Judge Twardowski of this court thusly found that these records were insufficient to enable him, the creditors, or the Trustee to determine the condition of the debtor:

> [i]t is abundantly clear that the debtor ... has failed to meet the requirement of the Code in this regard. The Debtor not only failed to keep any type of general ledger, employee record, or separate records of each construction project ... [and] insurance documents or records of expenses.

*Id.* at 716. The court found that the debtor was involved in an extensive and complex enterprise, even though the *Schultz* debtor's business involved only four (as opposed to over 20) properties. In the matter before the court, the Debtor provided only documents similar to those found inadequate in *Schultz:* copies of checks and check stubs, summaries of receipts from and disbursements to investors of the Plan, and documentation of deposits, and presented these in a very disorganized fashion. Further, case law has indicated that copies of tax returns, even when prepared by an accountant from whatever records the accountant can garner from the

taxpayer, are not a significant indicia of sufficient record keeping. The tax returns themselves clearly do not provide sufficient documentation, since they fail to provide itemization of transactions. *Underhill*, 82 F.2d at 260; *In re Switzer*, 55 B.R. 991, 995 (Bankr.S.D.N.Y.1986); and *Sherman*, *supra*, 24 B.R. at 508.

■ We recognize that the facts of this case are not as strongly congregated in favor of denial of discharge as those in *Trinsey*, 114 B.R. at 91; *Rusnak*, 110 B.R. at 776; and *Sherman*, *supra*, 24 B.R. at 508, where the respective debtors produced *no* written records whatsoever. However, as to written records, a debtor cannot "simply place tow sacks of records before the bankruptcy judge and request the judge to sift through the documents and attempt to reconstruct the flow of the debtor's assets." *Hughes*, *supra*, 873 F.2d at 264. The records must be such as to allow the Trustee, the creditors, and the court to meaningfully reconstruct the debtor's financial status. *See Noroian v. Hern*, 422 F.2d 1092, 1094 (9th Cir.1970); *Broad Nat'l Bank v. Kadison*, 26 B.R. 1015, 1018 (D.N. J.1983); *In re Dias*, 95 B.R. 419, 422–23 (Bankr.N.D.Tex.1988); *In re Ellison*, 34 B.R. 120, 124–26 (Bankr.M.D.Ga.1983); and *In re Braidis*, 27 B.R. 470, 472–74 (Bankr. E.D.Pa.1983). *But see In re Becker*, 74 B.R. 233, 236 (Bankr.E.D.Tenn.1987); *In re Usoskin*, 56 B.R. 805, 814–16 (Bankr.E.D. N.Y.1985); and *In re LaBonte*, 13 B.R. 887, 892–93 (Bankr.D.Kan.1981).

The records submitted by the Debtor, even with the assistance of counsel who surely realized that orderliness of the records was an issue and could have been thusly expected to present the records as coherently as possible, were as disordered as the contents of a "tow sack." Moreover, the contents of this "tow sack" were also extremely incomplete. Bank deposit slips and cancelled checks from only *some* of the investment transactions arising out of the Plan were produced. The most comprehensive record of the investments made in the Plan are pages of a spiral notebook which are juxtaposed with similar, sparse entries relating to the Debtor's other business ventures.

The Debtor produced no records regarding the all-important disposition and expenditure of the invested funds. The only record of the real estate involved was undated, listed but eight of over 20 properties, and, though typed, included numerous handwritten deletions and notes. As the principal who collected, paid out, and thus handled all of the money generated by the Plan, we cannot accept the Debtor's explanation that maintenance of these records were left to Bunn. It was incumbent upon the Debtor to maintain them or to see that they were maintained.

Returning to the factors recited at page 522 *supra*, we find that a business operation such as was contemplated by the Plan would customarily demand far more detailed and better organized records than the Debtor supplied.

As the Debtor was the person accepting and distributing the Plan's funds, we must characterize the Debtor's failure to produce better records as her own "fault." The records are so incomplete and disorganized as to render the accuracy of what was produced relatively insignificant. The allowances which we would make for the Debtor's lack of education and sophistication do not offset these other factors standing against her.

Nor are we swayed by the lack of the presence of any other "egregious conduct" or any adverse "courtroom demeanor" on the part of the Debtor. In this regard, we note that, unlike the debtors in *Rusnak*, *supra*, 110 B.R. at 773; *McCall*, *supra*, 76 B.R. at 493, and *Schultz*, *supra*, 71 B.R. at 713–14, 717, there is no proof or even a serious allegation that the Debtor pocketed any of the funds solicited for unauthorized personal purposes. We found her testimony to be credible, and thus her demeanor was convincing. However, we reiterate that intentionally wrongful conduct is not a necessary element of a § 727(a)(3) action. *See* page 522 *supra*.

■ Since we have found that the Plaintiffs have carried their burden of proving that the Debtor failed to keep adequate recorded information, we need only consid-

er further whether the Debtor justified her failure to maintain adequate records. The Debtor contended, in this regard, that her role in the Plan was "merely" to solicit prospective investors; and that it was Bunn's job "to do the rest," including maintaining books and records.

By her own admission, the Debtor's responsibility was to solicit prospective investors and procure their funds for eventual turnover of same to Bunn for the purchase of property. Admittedly, also pursuant to her testimony, all of the property to be rehabilitated was purchased by Bunn in his own name. However, without the Debtor's significant solicitative role, which was buttressed by the reliance which she calculated that her reputation would have in the community in which she solicited, the Plan would have been a non-functional enterprise. Further, the Debtor was the conduit through which the investment funds flowed, unfortunately commingled with funds in her personal bank account. Although she stated that she was merely an "agent" soliciting investments for the Plan, we find, to the contrary, that the Debtor's significant role and involvement in the functional operation of the Plan resulted in at least a shared duty to maintain records for the entire enterprise with Bunn.

There is no indication that the Debtor's relationship with Bunn was anything other than a business one. In this sense, the instant facts are distinct from the cases cited at page 523 *supra,* all of which involved the duty of recordkeeping between spouses. This distinction would not, however, appear to cut in the Debtor's favor. We believe that a person is more aptly entitled to trust and rely on a spouse or another person with which one has a personal relationship than a mere business associate. Therefore, we believe that the Debtor had a duty to oversee and assure herself that records were kept regarding Bunn's operations, just as he had the duty to oversee hers, irrespective of whether they had a formal partnership or other business relationship.

Clearly, the Debtor was "a knowing and active" participant in the entire Plan with Bunn, like the debtor in *Buck, supra.* She asserted no rational basis upon which she could have relied upon Bunn to have maintained records, as did the wife-debtor in *Cox.* She did not have nearly the basis for reliance upon Bunn that the unsuccessful debtor in *Rhoades* had for dependence upon his absconding wife.

Therefore, we conclude that the Debtor cannot justify her failure to maintain records for the entire scope of the Plan by any reasonable reliance on Bunn, just as she cannot defend against her lack of coherent record-keeping on the basis of her alleged lack of education, intelligence, or sophistication.

## F. CONCLUSION

An Order denying the Debtor's discharge must therefore be entered.