**In re Rose Marie BUCK, et al, Debtor.**

**James MacDONALD and Donna MacDonald, Plaintiffs,**

**v.**

**Rose Marie BUCK, et al, Defendants.**

**Chad CHESTERFIELD and Rydonia Chesterfield, Plaintiffs,**

**v.**

**Rose Marie BUCK, et al, Defendants.**

**Bankruptcy Nos. 4–85–02472WS, 4–85–0282 AC and 4–85–0310 AW.**

United States Bankruptcy Court, N.D. California.

June 9, 1987.

Ira M. Kleinman, Sweet & Kleinman, Lafayette, Cal., for plaintiffs.

Stephen M. Judson, Fitzgerald, Abbott & Beardsley, Oakland, Cal., for debtor-defendant.

DECISION

EDWARD D. JELLEN, Bankruptcy Judge.

## I. INTRODUCTION

The above-captioned adversary proceedings, which were consolidated for trial by Order of the Court filed June 11, 1986, were tried before the Court on April 7, 10, and 27, 1987. JAMES and DONNA MacDONALD, plaintiffs in adversary proceeding no. 4–85–0282AC, and CHAD and RYDONIA CHESTERFIELD, plaintiffs in adversary proceeding no. 4–85–0310AW, were represented by IRA M. KLEINMAN, Esq. The debtor, defendant in both adversary proceedings, was represented by STEPHEN M. JUDSON, Esq.

The adversary proceeding commenced by the CHESTERFIELDS seeks to render certain alleged obligations nondischargeable pursuant to Bankruptcy Code § 523(a)(2), (4), and (6). The adversary proceeding commenced by the MacDONALDS seeks to render certain alleged obligations nondischargeable pursuant to Bankruptcy Code § 523(a)(2), and also seeks an Order denying debtor's discharge pursuant to Bankruptcy Code § 727(a)(2), (3), and (5). These matters having been submitted, the Court now renders its decision.

## II. FACTS

A central figure in these adversary proceedings is the debtor's former spouse,

RON KARP ("KARP"). KARP is presently incarcerated and did not testify at trial, although the evidence submitted by the parties clearly establishes that a commendation to KARP for his virtue and honesty during the period relevant to this case would not be in order.

The debtor first met KARP in 1982 while she was vacationing in Mexico. Initially, he introduced himself as "PETER," but soon confessed to the debtor that his name was RON KARP and that he had used a false name because he believed his life was in danger as a consequence of activities he had engaged in while employed by the United States Central Intelligence Agency. KARP had never been employed by the CIA.

Thereafter, in June 1982, debtor and KARP were married, and set out to rent an apartment together in January of 1983. At the time, the debtor and KARP were unemployed. KARP had no personal identification, and had told the debtor that he was awaiting identification papers from Washington, D.C., and that the United States government had agreed to supply him with a new identity because of his CIA affiliation.

Before renting the apartment, KARP had managed to obtain copies of the tax returns of WILLIAM WALLACE, the debtor's brother, and learned that MR. WALLACE was employed by LOCKHEED AIRCRAFT. The debtor and KARP thereupon completed a joint credit application for the apartment, in which KARP held himself out as WILLIAM WALLACE, an employee of LOCKHEED. The debtor falsely stated in the application that she was an employee of GWENDOLYN FLASH, INC., a diamond wholesaler.

In January of 1984, apparently at KARP's suggestion, the debtor and KARP decided to purchase a house. The debtor and KARP used the same technique they had used with the landlord to induce the Sellers, plaintiffs JAMES and DONNA MacDONALD, to extend them credit in the form of a carry-back purchase money note and deed of trust. Again, KARP held himself out to be WILLIAM WALLACE, signed the purchase contract in that name, and furnished MR. MacDONALD with the tax returns of the real MR. WALLACE. Debtor represented that she was an employee of GWENDOLYN FLASH, INC.

Debtor testified that although the credit information she furnished to MR. MacDONALD was false, and falsified to induce him to extend credit, she believed that she and KARP would be able to service the house note from the profits of KARP's "Mexican investments."

KARP was, in fact, making profits, but not from Mexican investments. Sometime in 1984, or perhaps earlier, KARP began a scheme of soliciting people to invest in oil bonds. The investors included the MacDONALDS, who invested $13,000 in cash (and apparently did some home improvement work for additional credit to their investment), and the CHESTERFIELDS, who invested $174,050. The oil bond investments were a complete sham; there were no oil bonds, or investments, or returns to investors. The investor monies, including the monies KARP obtained from the MacDONALDS and the CHESTERFIELDS, were generally deposited by KARP into a checking account standing in the name of the debtor doing business as ALPHA DIVERSIFIED INTERNATIONAL ("ALPHA").

Debtor was the record owner of ALPHA and the only authorized signatory to the two bank accounts in ALPHA's name.

Eventually, the CHESTERFIELDS and MacDONALDS discovered that they had been defrauded in connection with their oil bond purchases. The MacDONALDS were not paid on their note and foreclosed their deed of trust. KARP left the debtor in May of 1985. Debtor, left with the fall-out of KARP's misconduct and two children to feed, filed her voluntary Chapter 7 petition on July 19, 1985.

## III. MacDONALDS' OBJECTIONS TO DISCHARGEABILITY

### A. INTRODUCTION

It is the MacDONALDS' contention that the debtor is liable to them for the losses

they sustained in connection with: (1) their oil bond investments; (2) the sale of the house; and (3) certain alleged damage to the premises while the debtor and KARP were in occupancy. With respect to the oil bond investments, the MacDonalds admit that it was partially the false representations of KARP, rather than the debtor, which induced them to invest. They contend, however, that the debtor was a knowing and active participant in a scheme to defraud them and is therefore chargeable under the law, and more specifically, Bankruptcy Code § 523(a)(2)(A), with both her own and KARP's wrong-doing. The MacDONALDS claim that their losses in connection with the house note are nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(B) because of the false written financial information they were furnished. As to the property damage, the MacDONALDS did not plead a claim for relief under Bankruptcy Code § 523(a)(6), but contend that the resulting losses from the property damage are properly includable in any damages that might be awarded in connection with the house sale transaction.

In response to the MacDONALDS' contention concerning the oil bond investment, debtor contends that she personally made no misrepresentations, and was not aware of the misrepresentations which KARP had made. Debtor also claims that she was at all times under the impression that the monies which were from time to time deposited into the ALPHA accounts were proceeds of her husband's Mexican investments, and that she had no reason to believe that the monies had, in fact, been swindled from the MacDONALDS, CHESTERFIELDS, or other innocent investors. Debtor further contends that she was the owner of ALPHA and the only signer on its bank accounts because her husband lacked identification.

B. OIL BOND INVESTMENT

The creditor in a nondischargeability action has the burden of proving by clear and convincing evidence that the indebtedness at issue is nondischargable. See, e.g., *In re Hunter,* 780 F.2d 1577 (11th Cir.1986), *In re Black,* 787 F.2d 503 (10th Cir.1986). Under Bankruptcy Code § 523(a)(2), the creditor must sustain this burden as to the following five elements, as enunciated by the Court of Appeals in *In re Taylor,* 514 F.2d 1370 (9th Cir.1975): (1) the debtor made the representations; (2) that at the time the debtor knew they were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

The evidence clearly showed and defendant has not disputed that this test, as applied to the conduct of KARP, has been met. The evidence showed, without contradiction, that KARP had represented to both the MacDONALDS and the CHESTERFIELDS that they would be receiving various oil bonds in consideration of their monies, and that he anticipated a substantial return on their investment. Both the MacDONALDS and the CHESTERFIELDS parted with their monies in reliance on these representations, which were false and proximately caused the resulting losses. No suggestion was made at trial or in the briefs submitted by defendant that the MacDONALDS' and CHESTERFIELDS' reliance was not reasonable, or that they had any reason to believe that KARP was not telling them the truth.

The question relevant to this adversary proceeding, however, is whether the debtor is chargeable with KARP's misconduct.

In this respect, two principles are applicable. The first is that fraud is not presumed, and that the type of fraud required to render a debt nondischargeable is positive fraud involving moral turpitude or intentional wrong, and not implied fraud which does not involve bad faith or immorality on the part of the defendant. *Neal v. Clark,* 95 U.S. (5 Otto) 704, 24 L.Ed. 586 (1877); 3 Collier on Bankruptcy, 15th Ed. ¶ 523.08[5], p. 523-50.

Secondly, a debtor who has made no false representation may nevertheless be bound by the fraud of another if a debtor is

a knowing and active participant in the scheme to defraud. 3 Collier on Bankruptcy, 15th Ed., ¶ 523.08[4], p. 523–49; *Amen v. Black,* 234 F.2d 12 (10th Cir.1956); *Matter of Newmark,* 20 B.R. 842 (Bky, E.D.N. Y.1982).

Was, then, the debtor a knowing, active participant in KARP's defrauding of the MacDONALDS such that she is chargeable with his fraud?

The Court believes that she was. In fact, with the exception of debtor's testimony that she did not participate in the investment solicitations and believed all the proceeds in the ALPHA bank accounts were from her husband's Mexican investments, almost all the evidence clearly points to the debtor's culpability. MR. MacDONALD testified that the debtor had encouraged him to invest by telling him about the other investors and assuring him that the "partners" of ALPHA would handle the investment if she and KARP were to die. MR. MacDONALD also testified that the debtor was present during at least six (6) different discussions he had had with KARP concerning the oil bonds before making an investment, and that the debtor had advised him that the other investors were being paid according to schedule and that several of the paid investors had elected to reinvest in the oil bonds. The debtor disputes this.

It is not disputed, however, that the funds the MacDONALDS sought to invest were paid to the debtor's order, or that the debtor was the owner of record of ALPHA and had filed a fictitious business name statement to that effect on August 3, 1984. MR. MacDONALD testified that he handed his two investment checks to the debtor, and the endorsements thereon bear the debtor's name.

It is also not disputed that debtor was the sole authorized signer on the two ALPHA bank accounts. The evidence also showed that debtor was sent, and customarily reviewed, the bank statements and cancelled checks on ALPHA's accounts, and was thus aware of the substantial monies which were coming into the accounts and of the disbursements therefrom. The checks drawn on ALPHA's accounts showed that the monies were used for personal living expenses of the debtor and her husband, home improvements, acquisitions of goods and vacations, and that debtor and her husband enjoyed a luxurious lifestyle with use of these monies. Debtor also knew that no money was ever returned to an investor, or used to pay any commissions, salaries, taxes, insurance, accounting or bookkeeping fees, license or permit fees, or any other business expenses related to Mexico or Mexican investments with the possible exception of various monies KARP withdrew from the account to fund his so-called business trips. Debtor also knew that she never sent any money to Mexico to fund any "Mexican investments" or for any other purpose. Thus, debtor was aware that ALPHA did not conduct its affairs as would a legitimate business enterprise.

The evidence further showed that the debtor never filed any state or federal tax returns during the period monies were being generated from the oil bond swindles. No plausible explanation was provided other than the debtor's disclaimer of responsibility and contention that her husband was at fault.

Debtor testified that the only reason she held record ownership of ALPHA and of the funds in its accounts was that her husband had not obtained his new identity from Washington, D.C. Debtor further testified that until the month prior to his departure, she never suspected that KARP was engaged in any fraudulent financial dealings. Debtor's explanation is thus ultimately grounded on the proposition that she believed that the United States government would take over three years (from almost the beginning of debtor's relationship with KARP through the approximate time of his departure) to comply with a commitment to furnish an employee with new identity papers, and would leave the employee during this period with no means of earning a livelihood or functioning in society. This, the Court does not accept. As the Ninth Circuit Court of Appeals stat-

ed in *In re Houtman,* 568 F.2d 651, 656 (9th Cir.1978):

> "We recognize that exceptions to dischargeability are to be strictly construed..... A canon of interpretation adjuring strictness is not, however, a justification for abandoning good sense."

Apart from the foregoing, plaintiff admits she participated with her husband in not one, but two, separate attempts to defraud creditors when they entered into the premises lease and purchased the home. As previously stated, on both these occasions, KARP and the debtor falsely represented KARP to be WILLIAM WALLACE, and KARP and the debtor obtained credit on the basis of WALLACE's tax returns and employment history. The debtor's only explanation was that KARP had advised her that California law permitted buyers to use a false identity in connection with real estate acquisitions.

Additional facts of relevance include the debtor's adoption, together with KARP, of the fictitious surname "LOREN" and use of this name in her dealings with the CHESTERFIELDS and on her ALPHA fictitious business name statement and bank accounts (which debtor claims was done to protect KARP's life), and her formation of a business enterprise (together with a MARSHALL BLOSS) named METAPETRO, INC., and opening of a bank account on May 20, 1985 (after or very close to the time KARP departed) with a signature card stating her business to be a "crude oil trading company."

The Court believes that the MacDONALDS have sustained their burden of proof, and have established that debtor is liable for the $13,000 cash they invested, and that this liability should not be discharged pursuant to Bankruptcy Code § 523(a)(2)(A). This amount is the total of the checks in the sums of $10,000 and $3,000 which MR. MacDONALD wrote to the order of "Rose Marie Loren" on November 16 and November 30, 1984, respectively.

Mr. MacDONALD testified that he was to receive an additional $6,500 in oil bonds for work he performed on the house. The evidence failed to show, however, that the work was undertaken by MR. MacDONALD in reliance on the representations concerning the oil bonds, or how the $6,500 was calculated. Accordingly, this amount is not properly includable as damages.

C. HOUSE PURCHASE

▇ The MacDONALDS' second contention is that debtor's obligation in connection with the house purchase should not be discharged pursuant to Bankruptcy Code § 523(a)(2)(B). Although the first four elements mentioned in *In re Taylor,* supra, have been established, the Court does not believe that the MacDONALDS have established that their loss was proximately caused by debtor's misconduct. California Code of Civil Procedure § 580d operates to bar a deficiency judgment on an obligation secured by a deed of trust following a foreclosure by power of sale. California Code of Civil Procedure § 580b bars a deficiency judgment in respect of a purchase money obligation to the vendor secured by a deed of trust covering a dwelling for four or fewer families. Thus, at the outset of the transaction, the MacDONALDS were limited to enforcement of their deed of trust to collect the obligation in the event of a default, and could not have looked to the personal assets of the debtor.

It is contended by the MacDONALDS, however, that an action for fraud is not an action on the obligation secured by the deed of trust. This issue has been the subject of several appellate decisions in California.

In *First Federal Savings and Loan Association v. Lehman,* 159 Cal.App.3d 537, 205 Cal.Rptr. 600 (1984), the Court held that in order for a creditor to avoid the bar of California's anti-deficiency legislation, the fraud alleged has to relate to the value of the property or involve waste. Here, the misrepresentations by the debtor concerned her husband's identity and her financial condition, rather than the property, and the MacDONALDS were therefore not deprived of the benefit of their bargain with respect to the value of the security

which they were to receive, or with respect to the remedy available in the event of a default. It would follow that any losses the MacDONALDS suffered in connection with the sale of the house were not proximately caused by the false financial information debtor furnished.

D. PROPERTY DAMAGE

As to the MacDONALDS' third contention, although it appears that debtor removed a hot tub, chandelier and several other items from the property before the MacDONALDS' foreclosure sale, the evidence did not establish that any material reduction in the value of the property resulted therefrom, given the absence of evidence of the amount of the MacDONALDS' credit bid at the foreclosure sale. The MacDONALDS have therefore not sustained their burden of proof by clear and convincing evidence that any waste was committed which would be nondischargeable, especially in the context of this litigation where the MacDONALDS did not allege a claim for relief under Bankruptcy Code § 523(a)(6). As to the claim for relief which was alleged, any damage to the property was certainly not proximately caused by the false financial statement. Finally, it appears that any recovery would have been barred under California's anti-deficiency legislation if a full credit bid was made at the foreclosure sale. *Cornelison v. Kornbluth,* 15 Cal.3d 590, 125 Cal.Rptr. 557, 542 P.2d 981 (1975).

IV. CHESTERFIELDS' OBJECTIONS TO DISCHARGEABILITY

The evidence showed that the CHESTERFIELDS lost the sum of $174,050 through investments in the oil bonds. On January 7, 1985, MRS. CHESTERFIELD wrote seven checks totalling $56,050 to the order of CROCKER NATIONAL BANK to fund an initial oil bond investment. On February 5, 1985, MRS. CHESTERFIELD funded a second investment by purchasing a cashier's check from LINCOLN SAVINGS in the sum of $104,000 and writing a personal check in the sum of $14,000, both of which checks were payable to the order of ALPHA DIVERSIFIED INTERNATIONAL. The entire $174,050 was deposited to ALPHA's deposit account at CROCKER NATIONAL BANK.

MRS. CHESTERFIELD received the same basic sales pitch from KARP as the MacDONALDS; specifically, KARP advised MRS. CHESTERFIELD that her money would be invested in oil bonds, that the bonds would yield approximately 100%, and that the investment would mature in approximately one hundred twenty (120) days. MRS. CHESTERFIELD testified that she was initially introduced to KARP by STEPHEN REID, a bond broker, and that during the course of a conversation with KARP, KARP had advised her that "my wife knows everything." MRS. CHESTERFIELD also testified that she had spoken on the telephone with the debtor, at which time she (MRS. CHESTERFIELD) quoted KARP's remark to the debtor and that the debtor had agreed that she knew everything. On one occasion, before MRS. CHESTERFIELD made a second oil bond investment, debtor had apparently advised MRS. CHESTERFIELD over the telephone that everything was going fine with her first investment. The CHESTERFIELDS acknowledged that the debtor was not present when KARP solicited their investment or when he described the supposed details, and that they had never met the debtor face to face.

The Court believes that the remaining facts applicable to the CHESTERFIELDS are indistinguishable from those applicable to the MacDONALDS, and that the facts stated in Part III B above, including the debtor's false representations to the MacDONALDS, establish that debtor is chargeable under Bankruptcy Code § 523(a)(2)(A) with KARP's fraud and false misrepresentations, that debtor is therefore liable to the CHESTERFIELDS in the sum of $174,050, and that such liability is nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A). By virtue of the foregoing, the Court need not consider the CHESTERFIELDS' remaining contentions.

## V. MacDONALDS' OBJECTION TO DISCHARGE

The MacDONALDS contend that the debtor's discharge ought to be denied pursuant to Bankruptcy Code § 727(a)(2), (3) and (5). In each case, the Court believes that the MacDONALDS have not sustained their burden of proof and that the debtor is entitled to a discharge in this bankruptcy proceeding.

Initially, the MacDONALDS contend that the debtor failed to keep or preserve adequate books or records from which her financial condition or business transactions might be ascertained, and that the debtor's discharge ought to be denied pursuant to Bankruptcy Code § 727(a)(3). The evidence showed, however, that during the period KARP was making the solicitations for the oil bond investments, the debtor had generally maintained and preserved the bank statements and cancelled checks for the two ALPHA accounts plus a third personal account, and had also maintained and preserved a check register. The debtor testified that after KARP had left her in May of 1985, she had telephoned the FBI and that the FBI had taken, and is still in possession of, numerous additional unidentified documents which related to her financial affairs. Although no corroborative testimony was provided in this respect, the Court believes that the records the debtor maintained were generally sufficient to establish her receipts and disbursements; indeed, plaintiffs were able to make great use of such documents in establishing their nondischargeability cases. Under these circumstances, the Court declines to bar the debtor's discharge pursuant to Bankruptcy Code § 727(a)(3).

The MacDONALDS' second contention is that the debtor transferred several items of property with intent to hinder, delay, or defraud her creditors and that her discharge should therefore be denied pursuant to Bankruptcy Code § 727(a)(2). The evidence showed that prior to the bankruptcy, debtor was in need of funds and had sold a number of items, including a washer, dryer and hot tub, in order to raise cash. The debtor had also transferred a motor vehicle after the filing of the petition. Debtor claimed that the vehicle belonged to the transferee, but admitted that she did not mention the vehicle in the portion of her statement of affairs covering property held for another person.

Debtor testified that she had consulted with attorneys ROBERT ATHEY and C. WALLACE COPPOCK, who advised her that she could permissibly transfer any items which were not permanently affixed to the real property.

It is the opinion of the Court that the foregoing facts do not establish by clear and convincing evidence that the debtor's discharge ought to be denied pursuant to Bankruptcy Code § 727(a)(2).

The MacDONALDS' final contention is that the debtor has failed to satisfactorily explain what happened to the funds in the ALPHA accounts and that the debtor's discharge should therefore be denied pursuant to Bankruptcy Code § 727(a)(5). In response, the debtor introduced into evidence a fairly complete explanation in the form of the bank statements and cancelled checks for the two ALPHA accounts and her personal account. The vast majority of the checks were written to fund home improvements and what the debtor characterized as personal living expenses.

The MacDONALDS correctly point out that a number of items drawn on the accounts were payable to cash or to the order of the debtor. For example, during the period January 21 to February 20, 1985, after debtor received the CHESTERFIELDS' money, debtor apparently transferred over $10,000 to her personal account from one of the ALPHA accounts. During the same month, $50,000 was transferred to CROCKER BANK out of the ALPHA deposit account in anticipation of a balloon payment coming due on the house note. The funds were not used for that purpose, and at least $45,000 was returned to the debtor. Debtor testified that $23,000 of these monies were used to fund her Hawaii trip, over $13,000 was spent to pay off the loan on a jeep, and that most of the balance was used for property improvements and

living expenses. Debtor admitted that she has no receipts to evidence most of these expenditures, and testified that she could not recall why she transferred $10,000 back to CROCKER BANK in early February 1985, apparently for the benefit of MARSHALL BLOSS.

The evidence also showed that on occasion, KARP forged the debtor's signature on checks drawn against the ALPHA accounts. Although the debtor generally ratified the forged signatures, the Court does not believe that the debtor can properly be called upon to account for the specific purposes which KARP made of the funds, and that the fact that KARP took the monies constitutes a satisfactory explanation for purposes of Bankruptcy Code § 727(a)(3).

The evidence was in conflict as to whether any cash which otherwise might not be accounted for was paid to MR. MacDONALD in connection with the home improvements he had undertaken; the debtor testified that at his request, MacDONALD was often paid in cash.

The evidence also showed that debtor used monies to purchase jewelry and an expensive fur, and to fund gifts for friends including an extravagant trip to Hawaii for the debtor and a number of her acquaintances (where at least $23,000 was spent), and that the debtor made a number of purchases from BREUNER's department store.

Thus, although the evidence showed that many of debtor's expenditures were extravagant and irresponsible and that the debtor could not account for all the funds coming into her possession, the Court believes the debtor has satisfactorily explained how most of the dollars coming into possession were utilized, and that the amounts not accounted for were relatively small in relation to the total for which the debtor has accounted. Under all of the circumstances, the Court holds that the debtor has satisfactorily explained the disposition of her assets for purposes of Bankruptcy Code § 727(a)(5), and that she is therefore entitled to a discharge.

## VI. CONCLUSION

This memorandum will constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure, and Judgments, to follow, will be entered accordingly.