**In re Scott Dustin STURGEON, Debtor.**

**Bank of Cordell, Plaintiff–Appellee**

**v.**

**Scott Dustin Sturgeon, Defendant–Appellant.**

**BAP No. WO–12–043.**
**Bankruptcy No. 10–15850.**
**Adversary No. 10–01197.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

May 14, 2013.

Submitted on the briefs: *

Gary D. Hammond of Mitchell & Hammond, An Association of Professional Entities, Oklahoma City, OK, for Defendant–Appellant.

Stephen J. Moriarty and Kevin R. Donelson of Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, OK, for Plaintiff–Appellee.

Before NUGENT, ROMERO, and JACOBVITZ, Bankruptcy Judges.

## OPINION

JACOBVITZ, Bankruptcy Judge.

The appellant, Scott Dustin Sturgeon (the "Debtor"), appeals the bankruptcy court's judgment in favor of the appellee, Bank of Cordell (the "Bank"), on the Bank's non-dischargeability complaint under 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). After a trial on the merits, the bankruptcy court concluded that, among other things, the Debtor engaged in a course and pattern of fraudulent activity to obtain loans and loan advances from the Bank rendering the debt in question non-dischargeable under 11 U.S.C. § 523(a)(2)(A). On appeal, the Debtor assigns error to various of the bankruptcy court's findings of fact. As the Debtor has not shown the bankruptcy court's decision under 11 U.S.C. § 523(a)(2)(A) to be the result of clear error, we AFFIRM the judgment.

## I. FACTUAL BACKGROUND[1]

The Debtor is a practicing veterinarian who is also engaged in the cattle business. The Debtor conducted cattle operations in his individual name and through S & D Cattle, LLC ("S & D"), a business he owned along with his father, Dr. David Sturgeon, referred to herein as David. The Debtor, David, and the Debtor's brother, Shane Sturgeon, all maintained commodity accounts with R.J. O'Brien, a commodities brokerage firm. The Debtor held commodity accounts in his individual name and in the name of 20/20 Cattle & Consulting, LLC ("20/20"), in which he owns a one-third interest along with David and Shane.

For several years prior to 2009, the Debtor and S & D financed their cattle operations through loans from the Bank. The Bank made loans to the Debtor and S & D to purchase cattle. The obligations to repay loan advances were secured by the cattle. To obtain funds, either the Debtor or David would identify the number of cattle to be purchased with the loan proceeds or, if the cattle had already been

---

* The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. Bankr.P. 8012. The case is therefore ordered submitted without oral argument.

1. The following is a general overview of the facts giving rise to this appeal. Unless otherwise noted, the facts are taken from the bankruptcy court's order and the trial court exhibits. Additional detailed factual findings upon which the bankruptcy court's rulings are premised will be discussed within the context of each asserted error on appeal.

purchased, the number so purchased. When the Debtor or S & D sold cattle, the check generally was made jointly payable to the Debtor and the Bank, as the lienholder.

The non-dischargeable debt owed to the Bank by the Debtor, either as co-signer on S & D's indebtedness or borrower, arose from the following seven loans:

| Note No. | Note Date | Borrower & Cosigners | Collateral | Principal Amount | Purpose |
|---|---|---|---|---|---|
| 05820 | 06–25–08 | Debtor & David | All livestock among other collateral | 150,000 | Purchase 80 steers and 128 other cattle |
| 65913 | 10–10–08 | S & D, Debtor & David | Same as above | 86,020 | Purchase 130 steers |
| 65914 | 10–10–08 | S & D, Debtor & David | Same as above | 86,000 | Purchase 124 heifers |
| 65915 | 10–10–08 | S & D, Debtor & David | Same as above | 70,000 | Purchase 75 steers and 25 bulls |
| 65933 | 11–06–08 | S & D, Debtor & David | Same as above | 84,000 | Purchase 46 heifers and 108 other cattle |
| 65948 | 12–04–08 | S & D, Debtor & David | Same as above | 102,000 | Purcha se 239 heifers |
| 66957 | 12–29–08 | S & D, Debtor & David | Same as above | 150,000 | Purchas e 22 steers and 224 heifers |

In granting these loans, the Bank required the Debtor to submit an annual personal financial statement. At the Bank's request, the Debtor submitted a personal financial statement on or before February 18, 2008.[2] The Debtor opened a commodity account in his name, for the benefit of S & D, in late December 2007 or in the first half of January 2008. The financial statement did not disclose the existence of any commodity accounts owned by the Debtor, S & D, or 20/20. Since trading in commodities can create significant financial risks, the existence of such an account would be material to the Bank's decision to extend credit to a particular borrower. The Bank was unaware of the existence of the Debtor's commodity account until sometime after it ceased making loans or extending advances to the Debtor or S & D.

The Bank also required S & D to provide a periodic cattle inventory report (sometimes "CIR") for the Bank to rely upon in making loans and approving loan advances. S & D provided CIRs to the Bank on or about July 16, 2008 and October 9, 2008. The Bank relied on S & D's cattle inventories to determine whether there was sufficient equity in the cattle to grant loans to S & D, to approve loan advances, and to approve S & D's retention of a portion of the cattle sale proceeds pledged to the Bank.

At some point prior to June, 2008, the Debtor, David, and Shane created a sham entity called the Sturgeon Partnership to market and sell cattle owned by S & D,

---

**2.** There is conflicting evidence regarding when the financial statement was submitted. The Debtor contends that he provided the financial statement to the Bank well before February 18, 2008 and prior to his opening a commodity account. Because we are not reaching the issue of whether the bankruptcy court erred in finding that the debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(B), we will not address this contention.

the Debtor, David, and Shane.[3] The Debtor executed numerous forward contracts on behalf of Sturgeon Partnership to sell cattle to Thigpen Livestock Company, Ltd. ("Thigpen"). David acted as an agent for Thigpen.[4] The contracts required Thigpen to provide a $30.00 down payment to the Sturgeon Partnership for each head of cattle sold. All the cattle belonging to S & D and the Debtor sold to Thigpen under the contracts were subject to the Bank's security interest. Thigpen made down payments of $30.00 per head by checks payable solely to the Sturgeon Partnership thereby allowing S & D, the Debtor, David and Shane to use those sale proceeds without oversight by the Bank as to the disposition of the funds. The down payment funds from the sale of S & D's cattle were deposited in S & D's account at the Bank, but none of the funds were paid to the Bank.

The Debtor also sold a portion of S & D's cattle that was pledged to the Bank to Thigpen in the name of Washita Veterinary Clinic (the "Vet Clinic"), an entity owned by David and his spouse, the Debtor's mother.[5] Payment was made directly to the Vet Clinic, and none of the funds were paid to the Bank. Neither the Debtor nor David disclosed to the Bank any material change in the way S & D did business.[6]

During the same year that the Sturgeon Partnership was formed, the Debtor and 20/20 suffered losses in their commodity accounts. The Debtor lost $43,777.08 and 20/20 lost $105,743.58. Because the Debtor's and 20/20's commodity accounts declined in value, he was required to deposit additional funds into them or be subjected to the involuntary sale of holdings in these accounts as necessary to restore them to the required "margin" position. The Debtor had not made sufficient financial arrangements to adequately respond to the margin calls. As a result, the Debtor and S & D diverted considerable funds to these commodity accounts. The funds came from loan advances from the Bank and from sales of S & D cattle pledged to the Bank. On more than one occasion when loan advances were used to cover margin calls, David represented to the Bank that the loan advances would be used to purchase cattle.

In January, 2009, the bank hired Jason Ferguson to count S & D's cattle pledged to the Bank and to prepare a CIR. Mr. Ferguson counted S & D's cattle with the Debtor on January 5, 2009, and with David on January 14, 2009. Mr. Ferguson submitted the cattle inventory report to the Bank on January 22, 2009. After receiving the cattle inventory report, the Bank prepared an equity report and discovered it was "about $300,000 deficient on cattle value to loan amounts."[7] Until then, the Bank was unaware of any problems with the loans.[8] The Debtor subsequently met with Bank officials who testified that the Debtor admitted that cattle went for mar-

---

**3.** The bankruptcy court referred to Sturgeon Partnership as a "fictitious entity."

**4.** Oct. 4, 2011 Trial Tr. at 116–117, *in* Appellant Appendix (the "Debtor's Appx.") at 204–05.

**5.** There is conflicting evidence as to whether the Debtor owned an interest in the Vet Clinic. His ownership interest in the Vet Clinic is not dispositive of the issues on appeal.

**6.** Oct. 4, 2011 Trial Tr. at 118, *in* Debtor's Appx. at 206.

**7.** Oct. 4, 2011 Trial Tr. at 202, *ll.* 9–10, *in* Debtor's Appx. at 290.

**8.** Oct. 4, 2011 Trial Tr. at 27, *in* Debtor's Appx. at 115.

gin calls.[9]

The Bank then made demand on the Debtor and S & D to move their loans. Instead, the Debtor and S & D chose to liquidate the Bank's collateral and apply the proceeds to their indebtedness. After analyzing the cattle inventories and various bank statements and other records, the Bank determined that after all the cattle had been sold, there were 896 head of cattle the Bank could not account for. The value of the 896 missing cattle was approximately $450,000.00. In May, 2010, the Bank filed an action against the Debtor and S & D in state court seeking to recover the balance due on the notes. The state court entered a money judgment against the Debtor and S & D (the "State Court Judgment"). The Bank filed a proof of claim in the bankruptcy case in the amount of $843,031.72.

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, on September 24, 2010. The Bank filed an adversary proceeding against the Debtor seeking a determination that the debt arising from the State Court Judgment is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6). The Bank alleged that the Debtor, either individually or on behalf of S & D: (1) obtained loans and loan advances from the Bank by use of a false financial statement; (2) misrepresented the purpose for which loan advances were used or to be used; (3) misrepresented the number of cattle owned by the Debtor or S & D; (4) sold cattle subject to the Bank's security interest and failed to remit the proceeds to the Bank; and (5) diverted proceeds from loans and sales of cattle to commodity accounts owned by the debtor or his family.

After discovery and briefing, the bankruptcy court conducted a two-day trial beginning on October 4, 2011. The Debtor argued that he did not obtain loans from the Bank using false pretenses, false representations, or actual fraud. He contended that his father made the offending representations and that he was unaware of the way in which his father managed the cattle operation. The Debtor also argued that the financial statement he submitted to the Bank was not false because he submitted it before he opened any commodity accounts. The bankruptcy court took the matter under advisement and required each party to submit proposed findings and conclusions of law. On May 22, 2012, the bankruptcy court issued findings of fact and conclusions of law and entered judgment against the Debtor on the Bank's non-dischargeability claim under Sections 523(a)(2)(A) and 523(a)(2)(B). This appeal followed.

## II. STANDARD OF REVIEW

A bankruptcy court's factual findings are reviewed on appeal for clear error; legal conclusions are reviewed de novo. *In re Paige*, 685 F.3d 1160, 1178 (10th Cir.2012). "A finding of fact is 'clearly erroneous' if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir.1985) (citation omitted). " 'If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir.2009) (quot-

---

**9.** Oct. 4, 2011 Trial Tr. at 28, 204, *in* Debtor's Appx. at 116, 292.

ing *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "This admonition applies equally regardless of whether the [trial] court's factual findings are based on credibility determinations[,] documentary evidence," or inferences from other facts. *Id.*, 555 F.3d at 1177.

## III. APPELLATE JURISDICTION

This Court has jurisdiction over this appeal. The bankruptcy court's judgment, which fully resolved the adversary proceeding, was entered on May 22, 2012. The Debtor filed a timely notice of appeal on June 4, 2012, and neither side elected to have this appeal heard by the United States District Court for the Western District of Oklahoma.

## IV. DISCUSSION

On appeal, we are asked to reverse the bankruptcy court's determination that the debt arising from the State Court Judgment is non-dischargeable under Section 523(a)(2)(A)[10] as a result of the Debtor having participated in a pattern and course of fraudulent conduct in order to obtain loans and loan advances from the Bank. We are also asked to reverse the bankruptcy court's determination that debt is non-dischargeable under Section 523(a)(2)(B) as a result of the Debtor having submitted a false financial statement to the Bank. The Debtor's alleged errors on appeal are disagreements with the bankruptcy court's factual findings.

As discussed below, we are not persuaded by the Debtor's arguments on appeal. The bankruptcy court's findings that the

Bank proved all necessary elements to sustain a claim under Section 523(a)(2)(A) are supported by the record, and we do not have a definite and firm conviction that the bankruptcy court erred with respect to those findings. Because we affirm the bankruptcy court's conclusion that the debt arising from the State Court Judgment is non-dischargeable under Section (a)(2)(A), we need not address the issue of whether that debt is also non-dischargeable under Section 523(a)(2)(B).

*A. The bankruptcy court's finding that the Debtor engaged in a pattern and course of fraudulent activity in violation of Section 523(a)(2)(A) is not clearly erroneous.*

■■■ Section 523(a)(2)(A) provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To sustain a claim for false representation under Section 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a false representation; 2) with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was [justifiable];[11] and 5) the creditor was damaged as a result. *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996). Intent to deceive can be inferred from the totality of the circumstances. *Copper v. Lemke (In*

---

**10.** References to "Section" or "§ " in this opinion refer to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

**11.** *See Field v. Mans*, 516 U.S. 59, 60, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (changing

the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable."); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791–92 (10th Cir.2009) (same).

*re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP2010) (citing *Young,* 91 F.3d at 1375).

 False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *See Marks v. Hentges (In re Hentges),* 373 B.R. 709, 725 (Bankr. N.D.Okla.2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotations omitted).[12] False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Stevens v. Antonious (In re Antonious),* 358 B.R. 172, 182 (Bankr.E.D.Pa.2006) (citing *Rezin v. Barr (In re Barr),* 194 B.R. 1009, 1019 (Bankr.N.D.Ill.1996)).

 A claimant may also sustain a claim under Section 523(a)(2)(A) by proving that the debtor engaged in actual fraud. Although the phrases "false pretenses," "false representation," and "actual fraud"

are often used interchangeably, the Tenth Circuit Bankruptcy Appellate Panel recently determined that actual fraud is a separately recognized provision within Section 523(a)(2)(A). *See Diamond v. Vickery (In re Vickery),* 488 B.R. 680, 691 (10th Cir. BAP 2013) (noting that "actual fraud under [Section] 523(a)(2)(A) is not limited to representations and misleading omissions[.]") (internal quotation marks omitted).[13] Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right." *Id.* at 690 (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich),* 259 B.R. 873, 877 (6th Cir. BAP 2001)).[14]

 False representations and implied misrepresentations that are intended to create and foster a false impression by co-conspirators in furtherance of a fraudulent scheme may be attributed to a debtor who is an active, willing and knowing participant in the fraudulent scheme for purposes of Section 523(a)(2)(A). *See, e.g., Blackmon v. Evans (In re Evans),* 410 B.R. 317, 321 (Bankr.M.D.Fla.2009) (fraudulent acts and representations made by co-conspirators are attributed to an active participant in the fraudulent scheme).[15]

---

12. *See also Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1374–75 (10th Cir. 1996) (failure to disclose may constitute a false representation or false pretenses under Section 523(a)(2)(A)); *Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1246 n. 4 (9th Cir.2001) (noting that a debtor's failure to disclose material facts can constitute a fraudulent omission under Section 523(a)(2)(A)); *The William W. Barney, M.D. P.C. Ret. Fund v. Perkins (In re Perkins),* 298 B.R. 778, 788 (Bankr.D.Utah 2003) (stating that "[a] false pretense as used in § 523(a)(2)(A) includes material omissions, and means implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotation marks omitted).

13. The BAP's decision in *Vickery* has been appealed to the Court of Appeals for the Tenth

Circuit on April 11, 2013, and assigned case number 13–1148.

14. *See also McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000) (Actual fraud under Section 523(a)(2)(A) is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another," and includes "all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth.") (internal quotation marks omitted).

15. *See also Aetna Cas. and Sur. Co. v. Markarian (In re Markarian),* 228 B.R. 34, 39 (1st Cir. BAP 1998) ("[S]ection 523(a)(2)(A) may include debts which arise from the wrongful

Fraudulent intent for purposes of Section 523(a)(2)(A) can be shown by establishing that the debtor was a willing participant in a fraudulent scheme and thereby intended to deceive a creditor. *Holmes v. Nat'l City Bank (In re Holmes)*, 414 B.R. 115, 131–32 (E.D.Mich.2009).

In ruling in favor of the Bank on its nondischargeability claim under Section 523(a)(2)(A), the bankruptcy court found that the principals of S & D orchestrated a fraudulent scheme and that the Debtor was an active participant. The fraudulent scheme had the following characteristics, which form the basis for the alleged errors on appeal:

1. The Debtor used a fictitious entity (the Sturgeon Partnership) and the Vet Clinic to divert cattle sale proceeds pledged to the Bank;[16]

2. The Debtor failed to use loan advances to buy cattle as represented to the Bank and instead diverted them to cover margin calls in the Debtor's commodity account;[17] and

3. The Debtor materially misrepresented the number of cattle owned by it to obtain loans and loan advances from the Bank and to obtain permission to use cattle sale proceeds pledged to the Bank.[18]

Based on our review of the record, we have determined that evidence exists to show that the Debtor and his father, David, perpetrated a fraudulent scheme aimed at deceiving the Bank. There is support in the record for the bankruptcy court's finding that the Debtor was an active, knowing participant in a fraudulent scheme to deceive the Bank through a series of false representations and false pretenses that created a contrived and misleading understanding by the Bank, and that the Debtor thereby intended to deceive the Bank. The false representations and false pretenses wrongfully induced the Bank to grant loans to S & D and the Debtor, approve loan advances, and permit use of cattle sale proceeds pledged to the Bank in S & D's operations.[19]

**B.** ***The bankruptcy court's finding that the Debtor and S & D used the Sturgeon Partnership and the Vet Clinic to divert cattle sale proceeds pledged to the Bank is not clearly erroneous.***

 In his first assignment of error, the Debtor argues that the bankruptcy court erroneously found that the Debtor helped create the Sturgeon Partnership as a sham entity to sell cattle pledged to the Bank and divert sales proceeds from the Bank. The Debtor contends that along with his father and brother he created the Sturgeon Partnership as a marketing device to obtain a better sales price for their cattle. He maintains that he and S & D remitted the down payment monies to the Bank as required by the security agreements, and the Bank permitted S & D and himself to keep excess proceeds from the cattle sales. The Debtor also contends that a portion of

---

acts of conspirators and their co-conspirators."); *MacDonald v. Buck (In re Buck)*, 75 B.R. 417, 420–21 (Bankr.N.D.Cal.1987) ("[A] debtor who has made no false representation may ... be bound by the fraud of another if a debtor is a knowing and active participant in the scheme to defraud.").

16. Debtor's Opening Brief at 1, 15.

17. *Id.*

18. *Id.* at 1, 26.

19. The Debtor has not assigned error to the bankruptcy court's findings of justifiable reliance on the part of the Bank or the amount of damages caused by the fraudulent scheme. Accordingly, those issues are not before us.

the cattle he sold through the Sturgeon Partnership and the Vet Clinic was not subject to the Bank's lien.

Substantial evidence shows that the Debtor and his father used the Sturgeon Partnership and the Vet Clinic to circumvent the Bank's rights as a lienholder. Regardless of his reason for forming the Sturgeon Partnership, the Debtor used the entity in an attempt to sell cattle to Thigpen free and clear of the Bank's lien and deprive the Bank of supervisory control over a portion the sales proceeds.

Thigpen, the buyer of the cattle, made down payments to the Sturgeon Partnership by check and did not name the Bank as a joint payee.[20] Those down payment funds relating to S & D cattle totaled some $90,000.[21] This was contrary to the Bank's practice and the Agricultural Security Agreements, which required any buyer to list both the seller and the lienholder on the check.[22] Although the Debtor argues that the Bank had access to the down payment monies because the funds were deposited into S & D's account, the Bank does not customarily monitor a customer's bank account for deposits and disbursements.[23] Thus, when Thigpen paid down payment monies of $30.00 per head of cat-tle to Sturgeon Partnership, the Bank was prevented from electing to apply the funds to the Debtor's outstanding loans even though the funds were deposited into S & D's account at the Bank.[24]

The Debtor was actively involved in the sales scheme. He personally executed the forward delivery contracts on behalf of the Sturgeon Partnership to sell cattle to Thigpen.[25] The contracts stated that the cattle would be delivered free and clear of all liens, and the Debtor admitted that he signed the contracts in order for S & D to get down payment monies.[26] S & D did not remit those down payment monies to the Bank, and the Debtor did not inform the Bank that he was using the Sturgeon Partnership to sell cattle or require the buyer to make down payments by checks naming the Bank as a joint payee.[27] On at least one occasion, the Debtor orchestrated a similar sale through the Vet Clinic and failed to remit a portion of the proceeds to the Bank.[28] Cattle sold through the Sturgeon Partnership and the Vet Clinic included cattle belonging to S & D as well as cattle belonging to the Debtor, David, Shane and affiliated entities.[29]

As the Debtor points out, there is conflicting evidence regarding the extent to

---

20. Oct. 4, 2011 Trial Tr. at 92–93, *in* Debtor's Appx. at 180–181; Bank's Exhibits 18–20, *in* Debtor's Appx. at 743–46.

21. Oct. 4, 2011 Trial Tr. at 93–94, *in* Debtor's Appx. at 181–82.

22. *Id.* at 70–71, *in* Debtor's Appx. at 158–59. *See also* Bank's Exhibit 4, *in* Appellee's Appendix (the "Bank's Appx.") at 5. The Agricultural Security Agreements, which were signed by the Debtor, provide that "[a]ll proceeds of any sale ... shall be made immediately available to Lender in a form jointly payable to Grantor and Lender."

23. Oct. 4, 2011 Trial Tr. at 97–98, *in* Debtor's Appx. at 185–86.

24. *Id.* at 92–93, 180–81.

25. Oct. 5, 2011 Trial Tr. at 33, *in* Debtor's Appx. at 349; Oct. 4, 2011 Trial Tr. at 116, *in* Debtor's Appx. at 204.

26. Oct. 5, 2011 Trial Tr. at 33, *in* Debtor's Appx. at 349; Oct. 4, 2011 Trial Tr. at 87, *in* Debtor's Appx. at 175; Bank's Exhibit 17, *in* Debtor's Appx. at 718–42.

27. Oct. 4, 2011 Trial Tr. at 91–95, *in* Debtor's Appx. at 179–83.

28. *Id.* at 112, *in* Debtor's Appx. at 200.

29. Oct. 4, 2011 Trial Tr. at 93, *in* Debtor's Appx. at 181; Oct 5, 2011 Trial Tr. at 11, *in* Debtor's Appx. at 327.

which the Bank authorized the Debtor to use any proceeds from the cattle sales as well as the exact number of cattle sold through the Sturgeon Partnership. It is clear from the record, however, that the Bank did not authorize the Debtor to sell cattle free and clear of its liens through the subterfuge of a sham partnership, thereby depriving the Bank of its right to supervise the disposition of the proceeds. Further, although the Bank did authorize S & D's retention of some of the cattle sale proceeds, the record supports an inference that the Bank would not have done so had it known that S & D was trading commodities, that loan advances made for the purchase of cattle were diverted to cover margin calls, and that its collateral position was deteriorating due to a large number of missing cattle. Accordingly, there is no clear error in the bankruptcy court's finding that the Debtor used a fictitious entity to deprive the Bank of down payment monies and circumvent its rights as a lienholder.

### C. The bankruptcy court's finding that the Debtor failed to use loan advances to buy cattle as represented to the Bank and instead diverted them to cover margin calls is not clearly erroneous.

■ Next, the Debtor argues that the bankruptcy court erroneously found that he requested loan proceeds from the Bank to purchase cattle but instead used the funds to cover margin calls in his commodity account. The Debtor asserts that his father David was the one who requested the loan advances from the Bank and traded in the Debtor's commodity account. It is undisputed that the Bank made the loans to S & D and the Debtor to fund their cattle operations and that each loan request was typically tied to a specific number of cattle to be purchased or that had been purchased.[30] In addition, the record indicates that a significant portion of the loan proceeds advanced for cattle purchases were siphoned into the Debtor's commodity account. The primary issue, then, is whether the Debtor participated in a scheme to divert loan advances to his commodity account or whether his father acted alone.

It is clear that David participated extensively in S & D's fraudulent scheme. David likely placed the majority of the calls to the Bank requesting the loan advances. The Debtor placed at least one such call, but it is unclear whether the Debtor made any specific representations regarding the use of the funds or whether S & D actually used the funds to purchase cattle.[31] David also was authorized to trade in the Debtor's commodity account and did so frequently.[32]

However, in light of the evidence in the record, the bankruptcy court's inference that the Debtor participated in the scheme to mislead the Bank regarding S & D's use of the loan advances is plausible. The Debtor personally signed each promissory note and Agricultural Security Agreement and was aware that the Bank expected S & D to use the loan proceeds to fund S & D's cattle purchases.[33] The record also suggests the Debtor knew that loan advances were being used to fund margin calls rather than for the purchase of cattle. On August 7, 2008, for example, the Bank advanced $31,906.00 to S & D so

---

**30.** *See generally* Debtor's Opening Brief at 1–3.

**31.** Oct. 4, 2011 Trial Tr. at 196–97, *in* Debtor's Appx. at 284–85.

**32.** Oct. 5, 2011 Trial Tr. at 28, *in* Debtor's Appx. at 344.

**33.** *See, e.g.,* Bank's Exhibit 4, *in* Bank's Appx. at 1–12.

that the Debtor and/or David could purchase 64 head of cattle.[34] Instead, the funds were deposited into Shane's bank account and then directly into the Debtor's personal commodity account.[35] Shane's accounts were overdrawn, and the Debtor did not list the transfer as a loan on his bankruptcy schedules.[36] The Debtor's family members similarly made deposits of loan advances into the Debtor's commodity account throughout August, 2008.[37] During that same month, the Debtor withdrew $35,000.00 from his commodity account to cover personal expenses, suggesting that he was aware of the recent deposits into that account.[38] The Debtor points out that David wrote each check transferring money from S & D's account to his commodity account. However, the Debtor opened the commodity account himself and received statements regarding the trades in those accounts.[39] This evidence supports the bankruptcy court's finding that Debtor was in collusion with his father to divert loan advances to his commodity account.

█ To the extent that any loan advances were diverted to his commodity account, the Debtor contends that the Bank authorized such use of the funds. The record does not support this assertion. The Debtor admitted that part of the reason he set up the commodity account in his name rather than in S & D's name was to hide the account from the Bank.[40] According to the Bank's chairman and the loan officer assigned to the Debtor's account, the Bank was not aware that the Debtor

was trading in commodities until after it made the loans in question.[41] The bankruptcy court accepted these assertions and found that the Bank did not authorize the Debtor to use loan proceeds to cover margin calls in his commodity account. "[D]eterminations of credibility ... lie peculiarly within a trial judge's province, and ... in the absence of exceptional circumstances, we ... defer to the trial court." *United States v. Raymond,* 369 Fed.Appx. 958, 972 (10th Cir.2010) (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)). There is no compelling reason to disturb the bankruptcy court's finding here.

### D. There is evidence in the record that the Debtor and S & D misled the Bank about the number of cattle S & D owned to obtain loans and loan advances and to obtain permission to retain cattle sale proceeds.

█ The Debtor also contends that the bankruptcy court erred when it found that the Debtor misrepresented the number of cattle the Debtor or S & D owned. David provided cattle inventory reports to the Bank on or about July 16, 2008 and October 9, 2008. The Bank's consultant, Jason Ferguson, prepared a cattle inventory report dated January 22, 2009. The Bank's chairman, Mr. Baker, performed a detailed accounting to trace S & D's cattle purchases and sales, which the bankruptcy

---

**34.** Oct. 4, 2011 Trial Tr. at 104, *in* Debtor's Appx. at 192.

**35.** *Id.*

**36.** *Id.* at 105, *in* Debtor's Appx. at 193.

**37.** *Id.* at 105–10, *in* Debtor's Appx. 193–98.

**38.** *Id.* at 110, *in* Debtor's Appx. 198.

**39.** Oct. 5, 2011 Trial Tr. at 28, *in* Debtor's Appx. at 344.

**40.** *Id.* at 44–45, *in* Debtor's Appx. 360–61.

**41.** Oct. 4, 2011 Trial Tr. at 22, 192, *in* Debtor's Appx. at 110, 280.

court accepted as accurate.[42] Mr. Baker used the first cattle inventory report as a baseline, and determined that, after all of the cattle were sold, there were 896 cattle that he could not account for.[43] The Debtor argues that Mr. Baker's accounting was inaccurate for various reasons. He contends that the January 22, 2009 cattle inventory report Mr. Ferguson prepared was inaccurate because S & D purchased and sold several hundred head of cattle between the time the count took place and the time Mr. Ferguson submitted the report. The Debtor also asserts that he did not prepare any of the cattle inventory reports and that he is therefore not responsible for misleading the Bank regarding the number of cattle S & D owned.

We agree that there is no significant evidence in the record suggesting that the Debtor was involved in preparing the July 16, 2008 or October 9, 2008 cattle inventory reports. The Debtor did not sign them.[44] David, not the Debtor, counted the cattle and submitted the reports to the Bank.[45] In addition, it does not appear that the cattle inventories themselves overstated the number of cattle as of the dates of the inventories.[46]

■■■ The accuracy of the actual inventory reports when prepared and the fact that David submitted them to the Bank is not dispositive of whether the Debtor and David created a false impression to mislead the Bank regarding its collateral position.[47] In making its findings, the bankruptcy court relied on the accuracy of the accounting Mr. Baker prepared reflecting 896 unaccounted for cattle between the date of the first cattle inventory report and May 11, 2009, when all of S & D's cattle pledged to the Bank had been sold. The accounting further reflects that between October 10, 2008 and January 22, 2009, Mr. Baker could not account for 574 of the 1637 cattle S & D should have owned, or about 35% of the herd.[48] During that period, S & D continued to obtain loans and loan advances and retain cattle sale proceeds. The Bank extended the credit and consented to use of cattle sale proceeds in reliance on S & D's equity in the cattle as reflected by the inventories, not knowing that its equity cushion was rapidly deteriorating or had evaporated. The Debtor did not proffer any accounting of his own regarding S & D's cattle purchases and sales. No plausible explanation was given for the missing cattle other than the unauthorized sale of cattle to cover margin calls.

The record also supports the bankruptcy court's finding that the Debtor actively participated in the scheme to conceal the missing cattle from the Bank. The record

---

42. Oct. 4, 2011 Trial Tr. at 30–33, *in* Debtor's Appx. at 118–121; Bank's Exhibit 15.0001, *in* Bank's Appx. at 16.

43. *Id.*

44. Bank's Exhibit 11, *in* Debtor's Appx. at 702–03; Bank's Exhibit 13, *in* Debtor's Appx. at 711–12.

45. Oct. 4, 2011 Trial Tr. at 224–25, *in* Debtor's Appx. at 312–13.

46. The bankruptcy court's finding based on Mr. Baker's accounting that there were 896 cattle that could not be accounted for is predicated on the first cattle inventory, which Mr.

Baker used as a baseline, being correct. The accounting shows that the second inventory report was substantially correct.

47. "[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (internal quotation marks omitted).

48. Bank's Exhibit 15.0001, *in* Bank's Appx. at 16.

suggests that the Debtor was aware that the size of S & D's cattle herd had been substantially reduced in the latter part of 2008 without the Bank's knowledge and for reasons unknown to the Bank. The Debtor was the chairman of S & D and owned 51% of the business.[49] He is a veterinarian and an experienced cattleman. Mr. Baker primarily met with the Debtor, not David, regarding the liquidation of S & D's cattle.[50] The Debtor signed each of the notes and security agreements for the Bank loans to S & D and executed all of the forward delivery contracts under which S & D sold cattle to Thigpen.[51] At least some of the cattle proceeds were siphoned away without the Bank's knowledge through sales to Thigpen. The Debtor was aware that calls were being placed to the Bank to obtain advances on those loans by representing the number of cattle purchased or to be purchased with the loan proceeds.[52] The Bank's loan officer testified that the Debtor admitted to him that at least some of the missing cattle were sold to make margin calls.[53] The Debtor signed the Ferguson cattle inventory report.[54] The number of missing cattle, which amounted to some 35% on January 22, 2008, and ultimately well over 50% of the herd as reported in the inventories, greatly exceeded the typical death losses for cattle operations of the type S & D conducted, which is less than three percent.[55]

Thus, even if each cattle inventory that David or Mr. Ferguson submitted was initially accurate, the totality of the circumstances supports the conclusion that the Debtor and S & D misled the Bank regarding its collateral position. The Debtor's and David's failure to inform the Bank about the missing cattle during the time S & D was obtaining new loans and procuring the Bank's consent to its use of sale proceeds constitutes false pretenses in the form of material omissions. Further, David's misrepresentations and material omissions can be attributed to the Debtor because he was an active, willing, and knowing participant in the fraudulent scheme.[56] We affirm the bankruptcy court's conclusion that the Debtor, along with his father, misled the Bank regarding the number of cattle owned by S & D as part of a scheme to defraud the Bank.

## V. CONCLUSION

After thoroughly reviewing the extensive record and considering the evidence as a whole, we are not persuaded by the Debtor's arguments on appeal. The bankruptcy court's finding that the Debtor engaged in a pattern and course of fraudulent conduct was supported by the evidence presented at trial and is not clearly erroneous. We therefore affirm the bankruptcy court's determination that the debt arising from the State Court Judgment is non-dischargeable under Section 523(a)(2)(A).

---

49. Oct. 5, 2011 Trial Tr. at 215, *in* Debtor's Appx. at 531.

50. Oct. 4, 2011 Trial Tr. at 161, *in* Debtor's Appx. at 249.

51. *See supra* nn.19 and 29.

52. Oct. 4, 2011 Trial Tr. at 196–97, *in* Debtor's Appx. at 284–85.

53. Oct. 4, 2011 Trial Tr. at 204, *in* Debtor's Appx. at 292.

54. Bank's Exhibit 14, *in* Debtor's Appx. at 713.

55. *Id.* at 160–61, *in* Debtor's Appx. at 248–49.

56. *See supra* n.16.